# CHARLESTON.

GILCHRIST *et al. v.* BESWICK *et al.*

*(GREEN, JUDGE, Absent.)

Submitted September 9, 1889.—Decided November 9, 1889.

1. EVIDENCE—MORTGAGES—ABSOLUTE DEED.

> It is competent to prove by parol evidence that a deed absolute on its face is in fact a mortgage.

2. EVIDENCE—ABSOLUTE DEED—MORTGAGE.

> Where the parol evidence leaves the question doubtful whether the conveyance should be considered an absolute deed or a mortgage, a court of equity will incline to hold it a mortgage.

3. EVIDENCE—ABSOLUTE DEED—MORTGAGE.

> The following facts and circumstances have great weight in leading to the conclusion that such conveyance is a mortgage, and not an absolute deed : *first*, that the grantor was hard pressed for money ; *second*, that the conveyance was preceded by negotiations for a loan by the grantee to the grantor ; *third*, that the parties did not apparently consider either the quantity or the value of the land conveyed ; *fourth*, that the price was grossly inadequate ; and, *fifth*, that the possession remained with the grantor after the conveyance.

4. CO-TENANTS.

> One co-tenant or joint owner of land can not clandestinely, or without fair notice to his co-tenants, stipulate with third persons for any private or selfish advantage and benefit to himself in respect to the joint property ; and, if he does so, a court of equity will, at the option of his co-owners, compel him to divide such benefits.

5. CO-TENANTS.

> All purchases or sales made of or in respect to the common property of such joint owners by one of them, though made for his own benefit, will, at the option of his co-owners, be declared by a court of equity to be for the common benefit of all the owners.

6. CO-TENANTS.

> When several parties, as tenants in common, own lands subject to a mortgage, and they enter into an arrangement by which one of such owners, with other parties, agrees to pay off the mortgage or buy in the land, and hold it subject to redemption by the other owners, and such arrangement is not fully complied with, but one of the owners, without explicit notice to the

---

*On account of illness.

others that he is not acting under said arrangement, buys in the land for his own benefit for the balance due on the mortgage debt, which is less than one tenth of the value of the lands, a court of equity will hold that the purchase was for the benefit of all the owners.

*W. P. Hubbard* for appellants.

*A. B. Parsons* for appellees.

SNYDER, PRESIDENT:

George W. Dobbin, being the owner of three tracts of land containing 26,000, 420, and 768 acres, respectively, situate on the waters of the Black Fork of Cheat river, in Tucker county, by deed dated April 12, 1864, conveyed the undivided one half of said lands to Addison Childs, and the remaining undivided one half of said 26,000, 420, and 768 acres of land the said Dobbins sold, and by deed dated December 16, 1873, conveyed to David Gilchrist, James N. Loughery, Joseph N. McCartney, Samuel Gress, and James McGee at the price of $25,000.00, of which the said purchasers paid down $5,000.00, and gave their four promissory notes for the balance, as follows: One note for $2,000.00, payable April 20, 1874, and three for $6,000.00 each, payble, respectively, at one, two, and three years from December 20, 1873, with interest thereon from the latter date. To secure said notes the said purchasers executed a trust-deed on their moiety of said lands to Robert A. Dobbin, trustee. The trust-deed provided that, in case of any default in the payment of any of said notes at maturity, the said trustee should sell the said lands "at public sale at the Exchange sale rooms, in the city of Baltimore, after having given at least thirty days' notice of the time, place, and terms of sale in two daily newspapers published in the city of Baltimore, which terms shall be one third cash, and the balance in equal payments in one and two years, or all cash, at the option of the purchasers."

On December 9, 1875, the said Joseph N. McCartney, sold and conveyed to Charles Beswick the undivided one twentieth of said lands; and about September 20, 1877, the said David Gilchrist sold and conveyed the undivided one twentieth of said lands to John F. Gilchrist. Afterwards,

about January 13, 1876, the said David Gilchrist and John N. Loughery each conveyed to said John F. Gilchrist an undivided one twentieth of said lands upon certain considerations, which the grantors claim have failed, and thus leaving in them equitable interests in said two twentieths of said lands. The vendees paid all of said purchase-money notes as they became due, except the last one of $6,000.00, and its interest, and, being unable to pay this note, Robert A. Dobbin, trustee, advertised the lands to be sold in July, 1878. Under an arrangement made by the said vendees and others, the said Charles Beswick and others went to the city of Baltimore on the day fixed for the sale, and by paying to the trustee $2,400.00, and agreeing to pay the residue of said last note in certain payments, the trustee abandoned the said sale and accepted said agreement. In compliance with this agreement the said Beswick and others paid the whole of said last note except about $2,000.00; and, upon the failure to pay this balance, the said trustee again advertised the said lands to be sold on December 21, 1878, and on said day he sold the whole of the trust lands, and the said Charles Beswick, H. D. Jones, J. B. Eisaman, and Michael Seanor became the purchasers thereof at the price of $2,100.00 in cash, being the balance due on said trust debt.

On the same day of the said sale the trustee conveyed the said undivided one half of said 26,000, 420, and 768 acres of land to the purchasers. Soon after the said sale the said purchasers sold, and by quitclaim deed dated March 31, 1879, conveyed to Peter Whitehead, the undivided one sixteenth of said lands, in consideration of $1,030.00 paid in cash. Subsequently, in consideration of $6,337.50 in cash, the said purchasers and Whitehead sold, and, by deed, with general warranty, dated January 12, 1883, conveyed to Henry G. Davis, Thomas B. Davis, and Stephen B. Elkins, their undivided one half of said 420-acre tract, and 425 acres, part of said 26,000-acre tract. Before the sale of December 21, 1878, by the trustee, Dobbin, as aforesaid, the said Joseph N. McCartney and Samuel Gress departed this life; the former leaving a widow and three infant children as his heirs at law, and the latter leaving a son, Gilmore Gress, his sole heir at law.

At the March rules, 1884, the said David Gilchrist, James N. Loughery, James McGee, and the widow and children of the said Joseph N. McCartney, deceased, exhibited their bill in the circuit court of Tucker county against the other persons before mentioned, in which, after stating the facts aforesaid, the plaintiffs aver that the sale of said lands made on December 21, 1878, by Dobbin, trustee, to Beswick and others, is invalid—*First*, because the price was grossly inadequate, being less than one twentieth of the value of the land at that time; and, *second*, because the trustee did not duly advertise said land and post notices of the sale as required by law.

The plaintiffs further aver that should said sale be held valid, the purchasers at said sale are simply mortgagees, and hold the said lands in trust for the plaintiffs and others. In support of this averment they allege that when the trustee, Dobbin, advertised said lands for sale, the owners, David Gilchrist and others, made an arrangement with said purchasers, Charles Beswick, H. D. Jones, J. B. Eisaman, and Michael Seanor, whereby the latter agreed to attend the sale and purchase the land at such price as would be sufficient to pay the balance of the purchase-money due thereon, together with the costs of sale, and that said purchasers were to give said owners two years in which to redeem the lands by repaying to said purchasers the price paid by them, with proper interest thereon and their reasonable expenses; that in accordance with this arrangement the said purchasers attended the sale and represented to the trustee that they were representing the owners, and thereupon the sale to them was merely formal, at the price of $2,100.00, the balance due on the trust debt; that after said sale the purchasers refused to give the owners any writing showing the terms under which they purchased said lands, and that finally, after they made the sale of part of said lands to Henry G. Davis and others as aforesaid, they wholly and flatly denied that the plaintiffs had any right to or interest in said lands, and positively refused to admit or in any manner recognize the arrangement under which the said purchase was made—all of which the plaintiffs aver is in fraud of their rights, and was a part of the original scheme and purpose of said pur-

chasers, concocted by them to secure said lands at a nominal price.

The plaintiffs aver that the defendant Whitehead, at the time he made the purchase of the one sixteenth of the lands as aforesaid, and at the time he received a deed therefore, had full knowledge of the rights of the plaintiffs, and the fraud of said purchasers, and that he is not, therefore, entitled to be protected as an innocent purchaser; but, if it should be held that he is an innocent purchaser, then they aver that said purchasers should account to them for the $1,030.00 of purchase-money paid by him for the land so purchased. In respect to the lands purchased by Henry G. Davis and others, the plaintiffs admit that the said Davis and his associates were innocent purchasers, and that being so, they claim that the defendants Beswick and his co-purchasers at the trust sale should account for the $6,337.50 received by them for said lands.

The defendants Beswick, Eisaman, Jones, and Seanor, in their joint answer to said bill, say that in June, 1878, Beswick informed the said McCartney that he would be one of three persons to pay off the balance, then about $8,000.00, due on the Dobbins trust-deed; that afterwards, on the the day before the day of sale advertised to take place in July, 1878, Jones, Eisaman, and Seanor were procured by the owners to compose the second party, and one Rush Marchand was to be the third party, to pay off said trust debt; that under this arrangement Beswick and others went to Baltimore, and by paying to the trustee $2,400.00, and agreeing to pay the balance due in sixty days, they induced the trustee to postpone said sale; that of this balance it was understood that Beswick was to pay one third, the said Marchand one third, and the said Jones, Eisaman, and Seanor one third; that Marchand wholly failed and refused to pay his part; thereupon respondents made other payments, reducing the balance on the trust debt to about $2,000.00, with the understanding that the owners of the lands should get a party to take Marchand's place, and pay his share of the debt; that the owners failed to get any party to do this, and thereupon said trustee advertised the land for sale, and the same was sold on December 21, 1878, and purchased by respondents, as hereinbefore set forth.

The respondents aver that the arrangement mentioned in the plaintiffs' bill, by which they were to pay off the trust debt and give the owners two years to redeem the land, failed and was abandoned by the parties when the owners were unable to get any one to take the place of said Marchand, or to pay the one third of said debt, and that thereafter respondents purchased the said lands for themselves as a last resort, to save the money already paid by them on said trust debt. Respondents further aver that said sale was fair and perfectly legitimate, and said lands were then and still are wild and unimproved, and were then worth but little, but that said lands have since advanced in price, and thus stimulated the plaintiffs to bring this suit. Respondents deny that said lands were not duly advertised, or that the price was so inadequate as to invalidate the sale, and they rely on the lapse of time and the laches of the plaintiffs in bringing their suit. There was a general replication to this answer. Many depositions were taken and filed, both by the plaintiffs and defendants, and on May 13, 1886, the court entered a decree dismissing the bill, and from this decree the plaintiffs have appealed.

The final decree, after reciting that the cause came on to be heard upon the bill, answers, replications, depositions, *etc.*, proceeds. "In consideration whereof the court is of opinion, from the pleadings, that the case is for the defendants. It is therefore adjudged, ordered, and decreed that the plaintiff's bill be dismissed," *etc.*

The appellants insist this form of the decree shows that the court dismissed the bill upon the pleadings alone, without reference to the proofs, and that this was error. Whether or not this is the proper interpretation of the decree does not seem to me to be very material, because, whatever may have been the grounds of the decree or the reasons for the action of the court, this Court can reverse the decree only in the event it is found to be erroneous upon the whole record, including all matters which were properly before the Circuit Court for its consideration, whether it did or did not in fact consider all of them.

This brings us to the main ground of error assigned by the appellants, which is that the Circuit Court erred in re-

fusing to compel the appellees, Beswick and others, who purchased at the trustee's sale, to execute the trust resting upon them by reason of the agreement with the appellants under which they purchased said lands. The difficulty in determining the question here presented arises out of the controversy in respect to the facts rather than the law. The appellants contend and insist that the proof shows that the purchasers at the trustee's sale are simply trustees, and that the conveyance of the lands to them is a mortgage, and not an absolute deed. On the other hand, said purchasers wholly deny that either the facts or circumstances disclosed by the record show that the said deed is a mortgage, but that they are fair purchasers, and hold the said lands free from any claim or equities in favor of the appellants, and that said conveyance is in fact, as well as in form, an absolute deed.

In *Vangilder* v. *Hoffman*, 22 W. Va. 1, it was held by this Court that it is competent to prove by parol evidence that a deed absolute on its face was in fact a mortgage; and that, when on the parol evidence it is doubtful whether the conveyance should be regarded by a court of equity as an absolute deed or as a mortgage, the Court will incline to hold it to be a mortgage. In that case it was also held that the "following circumstances and facts have great weight in leading a Court to the conclusion that a deed absolute on its face is merely a mortgage. *First,* that the grantor was hard pressed for money; * * * *second,* that the actual execution of the deed was preceded by a negotiation for a loan of money by the grantee to the grantor; *third,* that the parties did not apparently consider or contemplate the quantity or value of the land, when the deed was made; *fourth,* that the price professedly given for the land on the face of the deed was grossly inadequate; *fifth,* that the possession of the land has remained with the grantor." These principles, and others illustrating the rules applicable to cases such as the one at bar, have been repeatedly affirmed and declared by this Court. Among the cases are the following: *Davis* v. *Demming*, 12 W. Va. 247; *Lawrence* v. *Du Bois*, 16 W. Va. 443; *Hoffman* v. *Ryan*, 21 W. Va. 415.

The evidence in the case before us fully establishes all of

the facts and circumstances above mentioned to be indicative of a mortgage, except, perhaps, the last one in respect to the possession of the lands after the conveyance. These lands, as the proofs show, were at the time of the sale, and still are, wild and unimproved. They were therefore necessarily unoccupied by either party; but the appellees complain in their testimony that the appellant's failed to pay the taxes on the lands. This is equivalent to an admission that the lands were really the property of the appellants. But, aside from any rigid analysis or nice distinctions, both the law and the facts in this case seem to be for the appellants.

All the testimony on behalf of the appellants is direct and positive that the appellees, Beswick and others, made the purchase at the trustee's sale, with the distinct understanding on the part of the appellants, at least, that they were to have two years in which to redeem the lands by reimbursing said purchasers for all they had paid or might properly pay on account of the lands, either in discharging the trust debt, paying taxes or other expenses, whether such payments had been made before, at the time of, or after the sale, together with the interest thereon, and reasonable compensation for their trouble. And the testimony of the appellees does not directly contradict the fact that such was the understanding, but they attempt to qualify it by showing that this agreement was made upon the faith of Marchand, or some one in his place, furnishing the one third of the money for carrying the agreement into effect. They admit that the money paid in July, 1878, as well as that paid between that time and the sale of December 21, 1878, was paid by them under this agreement; but they claim that after Marchand failed to comply with his part of the agreement, and the appellants were unable to procure any one else to take his place, they became absolved from the agreement, and had the legal right to purchase on their own account, without reference to said agreement; and that they did in fact consider and believe that said agreement was at an end before the sale of December 21, 1878, and upon this belief they acted and made said purchase for themselves on their own account, and free from any equities or claims on the part of the appellants by reason of said former agreement or otherwise. This

seems to be the claim of the appellees, but there is much testimony in the record and many circumstances tending to prove that for several years after the sale the appellees conceded the right, or at least that they did not positively repudiate or deny the right, of the appellants to redeem the lands upon the terms of said agreement.

It is certainly true that at no time before the trustee's sale did the appellees, Beswick and others, distinctly notify or inform the appellants· that they intended to make said purchase on their own account and absolutely for themselves. Such notice was not only required by good faith, but was indispensable to relieve the purchase from the conditions of the agreement under which they admit they had commenced the transaction, and continued to act up to the time of the sale. It was not enough that the appellees had determined in their own minds and among themselves that they would not continue the act under said agreement after they found that the appellants had failed to secure a third party to take Marchand's place, but it was their legal duty, under the circumstances ·then existing, to distinctly and unequivocally inform the appellants that they would not act further under said agreement, and that they had determined and intended to purchase the lands for themselves and solely on their own account. As they failed to do this before the sale, and thus afford the appellants an opportunity to protect their interests at the sale, they had neither the legal nor the moral right to purchase the lands on their own account, and their attempt after the sale to claim that the lands were purchased without reference to said agreement, and to deny that the appellants had any equities or interest in the lands, would be and is a fraud upon the rights of the appellants which can not be countenanced or sustained in a court of equity.

Upon another view of the conceded facts, this case must be decided for the appellants. Under the agreement as admitted by all the parties, it was the duty of the appellees Jones, Eisaman, and Seanor to furnish the one third of the money necessary to carry the agreement into effect. This was all they ever did furnish or were required to furnish. The other two thirds were furnished by Beswick. Now, if Bes-

wick is bound by the agreement, notwithstanding that he furnished more money than was contemplated by the original agreement, then certainly his co-purchasers, Jones, Eisaman, and Seanor, who did and were required to do no more than was contemplated by the agreement, are certainly bound, and have no right to complain. The only question then is, was Beswick bound to make the purchase under the agreement? The record shows that he was the joint owner or tenant in common with the appellants of the whole of the lands in controversy before and at the time of the purchase at the trustee's sale. It is a well-settled principle of law that one partner can not clandestinely stipulate with third persons for any private and selfish advantage and benefit to himself in respect to the partnership property.

All partnership property, and contracts in respect thereto, should be managed for the equal benefit of all the partners, according to their respective interests. If, therefore, any one partner should stipulate clandestinely for any private advantage or benefit to himself, to the disadvantage or in fraud of his partners, he will in equity be compelled to divide such gains with them. In all purchases and sales made on account of the partnership, or in respect to the partnership property, every partner is bound to act expressly for the benefit of the partnership; and if he fails to do so equity will compel him, at the election of his copartners, to divide the gains or hold the purchase as partnership property. *McMahon* v. *McClernan,* 10 W. Va. 419. Colly. Partn. §§ 179–182. These authorities speak specifically of partnerships, but the doctrine they announce is equally applicable to all joint enterprises or dealings between persons in respect to property held by them in common, whether such property be real or personal estate. *Forrer* v. *Forrer,* 29 Gratt. 134; *Rothwell* v. *Dewees,* 2 Black, 613; Story, Partn. § 175. According to the doctrine here announced, if Beswick, who was a joint owner or partner in the lands sold, had purchased without any attempt at an understanding that he was to purchase for the common benefit of all the owners, he would nevertheless be held in good conscience and equity to have purchased for the common benefit of all; and therefore, *a fortiori,* will a court of equity hold him

bound to hold the property for his co-owners as well as himself, when it is shown that he made the purchase under an agreement to that effect, which his co-owners, at least, believed still existed, and which he failed to notify them he considered to be at an end, even if he did so consider it —a matter that the testimony, to say the most of it, leaves in doubt.

This conclusion makes it unnecessary to consider the other assignments of error in regard to this branch of this appeal. In respect to the purchasers from Beswick and his associates after the conveyance of the land to them by the trustee, it is necessary to say but little. The appellants concede that the sale to the Davises and Elkins was *bona fide*, and that they are entitled to hold their land. This being so, Beswick and his co-purchasers from the trustee must account for the purchase-money received for said land, with the interest thereon from the time it was in fact paid to them. As to the defendant Peter Whitehead, the bill alleges that he purchased with the full knowledge of the rights and equities of the plaintiffs in the lands conveyed to him. The bill is taken for confessed as to him. He filed no answer to it. Beswick in his deposition says that Whitehead took his one sixteenth interest on the terms and at the price of the original purchase. This I understand to be that he came into the ownership as one of the original purchasers in all respects as if he had purchased from the trustee. This view is confirmed by the character of the conveyance to him, which is simply a quitclaim deed, without any covenants on the part of the grantors. Whitehead in his deposition does indirectly and doubtfully state that he knew nothing about the claims of the appellants to the land until after he purchased, but on cross-examination he fails to make any positive denial of such notice, but, on the contrary, his whole testimony leaves a strong impression that he did have notice of the appellant's equities, either from them or the parties who conveyed to him. But inasmuch as he failed to answer the bill and deny such notice, or claim that he was an innocent purchaser, we must hold that he is not a *bona fide* purchaser, and that the interest held by him is subject to the same equities in favor of the original owners as is that of Beswick, Jones, Eisaman and Seanor.

For the reasons before stated, I am of opinion that the decree of the Circuit Court must be reversed, and the cause remanded to that court for further proceedings there to be had in accordance with equity and the principles announced in this opinion.

REVERSED.  REMANDED.