## CHARLESTON

### REED v. BACHMAN.

Submitted June 9, 1905.    Decided March 5, 1907.

1. JOINT TENANT OR TENANT IN COMMON—*Adverse Possession as to Co-Tenant—When.*

   To enable one joint tenant or tenant in common in exclusive possession of land to effect an ouster against his cotenant; so as to defeat the right of such cotenant by adverse possession under the statute of limitations, such cotenant must have notice or knowledge of such hostile claim. Mere silent possession ever so long, by one taking rents and profits, without notice or knowledge of such adverse claim on the part of the other, will not be adverse possession under the statute. (p. 455.)

2. JOINT TENANT—*Exclusive Possession—Ouster—Statute of Limitation.*

   Where one joint tenant is in exclusive possession under the common title, a co-tenant cannot lose his right by mere *laches* in failing to demand admission into joint possession or share of the rents and profits. There must be an ouster operating to give title under the statute of limitations. (p. 455.)

3. JOINT TENANTS OR TENANTS IN COMMON—*Land Of—Sold Under Deed of Trust—Title Acquired by Joint Tenant—When.*

   Where one joint tenant or tenant in common acquires title from a sale under a deed of trust made by all the cotenants for a debt binding all, and the sale is caused by his failure to pay his share of the debt, he cannot, under his right so derived, hold the land against his cotenants. (p. 460.)

Appeal from Circuit Court, Pleasants County.

Suit by Joseph S. Reed against Margie E. Bachman et al. Bill was dismissed on demurrer and Reed appeals.

*Reversed.*

H. P. CAMDEN; R. E. BILLS; G. D. SMITH; and EDWARD A. BRANNON, for appellant.

VAN WINKLE & AMBLER; CLYDE B. JOHNSON; J. H. W. SIMPSON; and JOHN F. BARRON, for appellees.

BRANNON, JUDGE:

In November, 1903, Joseph S. Reed began a suit in equity against the administratrix and heirs of Bachman, the Vespertine Oil Company and others. Numerous demurrers were

filed by Bachman's representatives, and other defendants, relying upon want of equity in the bill, *laches*, staleness of demand and the statute of limitation. The bill was dismissed on demurrer, and Reed appeals.

As appears from the bill in 1870, Paterson, Doutt and Braford conveyed a tract of 1500 acres of land in Pleasants county to Reed, Reno, Reeves and Bachman for the consideration of $5,500, of which $3,500 was paid cash, and for the residue Reed, Reno, Reeves, Bachman and Swope united in a deed of trust conveying the land to Hall, trustee. Swope was not included in the deed, but intended to take a fifth interest. Reed advanced for Swope his share of the down payment, but Swope never repaid Reed in money. Soon after said parties acquired said land Reed, Reno, Reeves, Bachman and Swope entered upon the manufacture of lumber from the timber on the land. Bachman was placed by the parties in exclusive management and control to carry on the work as trustee and agent of his cotenants. In the panic of 1873 the business failed and was abandoned. In July, 1874, Reeves conveyed his interest to Reed and Bachman, and they made a deed of trust on the Reeves interest to secure payment of the purchase money going to Reeves. Reno transferred his fifth to Reed, but made him no deed for it. Reed claimed also the Swope interest, having paid for it. Reed claimed seven-tenths. Bachman is conceded to own his original fifth interest and half the Reeves fifth, making a three-tenths interest in the tract. In 1877 the Reeves fifth was sold under the deed of trust made by Reed and Bachman to secure Reeves its purchase money, and Cain and Doutt became purchasers, and took a deed from the trustee for said fifth, and a few days thereafter Cain and Doutt conveyed the said Reeves fifth to Bachman. Bachman never paid any part of the purchase money on the original purchase. Reed paid more than his fifth. He paid fully his share of the deferred purchase money. A few days after Bachman had so acquired the Reeves fifth, Doutt, one of the creditors of the Reeves interest, and also a creditor in the original deed of trust given to Hall in 1870 by Reed and others, on the 1,500 acres to secure its purchase money, executed a release to Bachman releasing the lien as to two undivided fifths of the tract of 1,500 acres. A few

days after this release sale was made by the said trustee under the trust deed given in 1870 on the 1,500 acres to secure its purchase money, the sale being the three-fifths of the said tract and Doutt became the purchaser, and took from the trustee a deed for the three-fifths, and a few days later Doutt conveyed said three-fifths to Bachman. Bachman has been in the sole exclusive possession of the land since about 1870, when the joint lumber business began. He went upon the land into a house built on it by the joint owners about 1870, and after the abandonment of the lumber business by the joint owners in 1873 Bachman remained in sole possession. From 1870 to 1885, when he died, Bachman was in sole possession, cutting timber from the land, using the land, taking all its rents and profits and rendering no account thereof. Since Bachman's death his widow and heirs have continued such possession, taking the rents and profits, leasing to various ones for oil, and they developing oil, and paying shares of it to the Bachmans, and the Bachmans rendering no account thereof. No demand was ever made by Reed on Bachman or his heirs for an account of rents and profits. Reed resided in Pennsylvania, and as the bill states still trusting Bachman as his cotenant, agent and trustee in possession of the land and ignorant of the sales under the trust deeds until 1884. Reed had not seen Bachman from 1874 to 1884, and had had no communication with him. The bill says that in 1884 Reed met Bachman in Pittsburgh, and Bachman told Reed that in order to protect their joint interests he had certain interests in the land sold under the deeds of trust, and had bought them in for the joint benefit of Reed and himself, and that Bachman by agreement with Reed then made was to remain in possession of the whole tract as Reed's cotenant and trustee and use and occupy the dwelling house in consideration of payment of all taxes. The bill says that Reed knew nothing of Bachman's death until the year 1900 or 1901. The bill states that when the lumber business failed Reed was without means of support from insolvency, and at the age of sixty years was beginning life over again, and paid no attention to the land, because he regarded it valueless to him so long as he was without money to improve and cultivate it, and for the further reason that he had placed Bachman in full charge and

control of the land as his agent and cotenant, and trusted implicitly to him to protect Reed's interest. The bill charges that Bachman derived from the land much money, amply sufficient to discharge the said deeds of trust, and more; the bill charges that Bachman had plenty of money in his hands belonging to himself and Reed to pay off the trusts, but that he refused to pay them in order to have sales made under them, so that he might buy in the land and hold it in sole ownership; that to that end he fraudulently and wrongfully colluded and conspired with the trustees under said · deeds of trust, and with Doutt and Cain, purchasers under the sales under said trusts, to accomplish the end aforesaid. The bill states that Reed became embarrassed in 1873 and in 1876 made an assignment to Dicken of his property, including his interest in this land, for the payment of his creditors; but that his other property discharged his debts, and that Dicken reconveyed his interest in this land to him by deed, 25th September, 1903. The bill further states that Bachman's heirs had by certain oil companies as lessees caused large quantities of petroleum oil to be taken from the land, and that large amounts of money had been received therefrom by said heirs in the way of rentals and royalties, and by the lessees under the Bachman right, without any account therefor to Reed. The nature or character of the estates conferred by these leases is not specified in the bill. The bill set up the title claim of Bachman, and claimed that the said purchases by Bachman derivatively from said trust deeds were for the common benefit of Reed and Bachman as cotenants, and that Bachman could not claim under them for his sole ownership, and prayed that Bachman's heirs and their lessees who had taken oil from the land be required to account for Reed's interest therein, and that the land be partitioned between him and Bachman's heirs according to their respective rights.

In our conception of this case the question is, Is Reed barred by adverse possession under the statute of limitations? "An actual ouster of one tenant in common cannot be presumed, except where the possession has become tortious and wrongful by the disloyal acts of the cotenant, which must be open, continuous and notorious, so as to

preclude all doubt of the character of his holding or the want of knowledge thereof by his cotenant. This conduct must amount to a clear, positive and continued disclaimer and disavowal of his cotenant's title, and an assertion of an adverse right; and a knowledge of this must be brought home to his cotenant." *Boggess* v. *Meredith*, 16 W. Va. 1. "The possession of one parcener is ordinarily regarded as the possession of all his coparceners, and such possession being subordinate and not adverse cannot, however long continued, operate as a bar to his co-parceners. A parcener in possession may disseize his coparcener; and from the time of such disseisin his possession will be adverse. Where one parcener occupies the common property notoriously as the sole owner, using it exclusively, improving it and taking to his own use the rents and profits, or otherwise exercising over it such acts of ownership as manifest unequivocally an intention to ignore and repudiate any right in his coparceners, such occupation or acts and claim of sole ownership will amount to a disseisin of his coparceners, and his possession will be regarded as adverse from the time they have knowledge of such acts or occupation and claim of exclusive ownership. It is the *intention* of the tenant or parcener in possession to hold the common property in severalty and exclusively as his own, with knowledge or notice to his cotenants of such intention, that constitutes the disseisin. The notice or knowledge required must be actual, as in the case of a disavowal or disclaimer of any right in his cotenants; or the acts relied on, as in the case of expulsion, making costly improvements and exercising exclusive ownership, must be of such an open notorious character as to be notice of themselves." *Cooey* v. *Porter*, 22 W. Va. 120. These old time doctrines have been uniformly held by this Court in many decisions, among them *Justice* v. *Lawson*, 46 W. Va. 163 and *Cochran* v. *Cochran*, 55 *Id.* 178. *Parker* v. *Brast*, 45 W. Va. 399, says: "As the possession of one cotenant is the possession of all, *laches*, acquiescence, or lapse of time cannot bar the right of entry of a cotenant until the actual disseisin has been effected by some notorious act of ouster brought home to his knowledge." Upon these principles, and under the facts stated in this bill it is impossible to say that Reed's right has become barred by adverse possession.

There has been no adverse possession. The parties were co-tenants and there has been no legal ouster. They started out as joint tenants in the year 1870. After several years of joint ownership, with Bachman in exclusive possession, Bachman acknowledged a continued joint tenancy with Reed, because in 1874 Bachman joined with Reed in acquiring the Reeves fifth interest. Thus he acknowledged the continued joint right in a most decisive manner. The two joint tenants, Reed and Bachman, united in acquiring the interest of a third joint tenant. Three years later Bachman acquired interests sold under the deeds of trust. Seven years after he had acquired such interests he met Reed and told him that he had caused the sales under the deeds of trust; admitted that he had caused such sales to be made; but stated to Reed that he had done so to save the interests of Reed and himself jointly, and had purchased for their joint benefit. Thus, a year before his death Bachman, in good faith to his brother tenant, admitted that brother's continued right, and Reed and he made the further agreement that Bachman should remain in possession of the land as he had done for years, and use it and keep the taxes paid. The law required Bachman, if he intended to claim to his exclusive ownership, to say so to Reed. Instead of doing that he expressly told him that he made no hostile claim acquired under the said deeds of trust sale. A year before Bachman's death by this interview and contract for continued friendly possession Bachman lulled Reed into sleep and a feeling of security, and it would be a gross wrong and against law to allow Bachman or his heirs to have prevailed under the theory of ouster when there was no ouster, and when Bachman recognized Reed's right. Can it be said that Bachman's taking the rents and profits can operate as ouster? Such taking will not alone amount to ouster of one joint tenant by another; but the facts stated in the bill show that Bachman did not intend that his taking the rents and profits should so operate, because in 1884, by the conversation and contract stated, he conceded that his taking rents and profits prior to that date had been without intent to set up adverse claim to the land; and by it also he agreed that his taking the rents and profits in future should not so operate, because such taking of rents and profits was

but in pursuance of the agreement that their estate was one of joint ownership and that Bachman should continue in possession and take the rents and profits and pay the taxes. And, moreover, by this agreement between Reed and Bachman in 1884, as well as in 1870, Bachman agreed to hold in trust, made himself a trustee, if it were necessary to say so, as it is not, because he was a cotenant in joint tenancy, which is enough. A trustee cannot deny the trust and plead the statute without a disavowal of the trust with notice to the beneficiary. *Nease* v. *Capehart*, 18 W. Va 95. It will be seen from the law above quoted from West Virginia decisions that mere silent possession by one joint tenant, however long continued, will not work an ouster and cause the statute to bar another joint tenant. There must be some overt, open notorious act of a character to indicate an intention of adverse claim, so as to preclude all doubt of the character of his adverse holding, whereas taking profits by one cotenant in possession is but the exercise of a legal right, subject to an accounting to another for his share. There must be clear, positive, continued disclaimer of his cotenant's right and an assertion of his own adverse right. *And that is not enough.* His cotenant must know of such adverse claim and tortious acts. He is not bound to inquire, because he can repose in confidence of his cotenant's good faith. That cotenant must notify him of his adverse claim, or at any rate, he must know of it. The burden is on Bachman to show that Reed knew of both the purchase and adverse claim under it. *Buchanan* v. *King*, 22 Grat. 414. No matter what the acts of one cotenant may be, whether by taking deed for the whole or by taking rents and profits, or what not. That will not do; for our decisions say with emphasis that such knowledge or notice of hostile claim on the part of the co-tenant must be shown. There is not a particle of appearance on the face of this bill, which we must take to be true on demurrer, that Reed, living in a distant place, had notice or knowledge of any adverse claim. The bill distinctly states that Reed had no such notice of any adverse claim by Bachmam. That would be enough to repel the idea of ouster. But, more than that, the bill states that in 1884 Bachman told Reed that he had purchased the interests sold under the deeds of trust for their joint benefit

and would continue in possession as cotenant and trustee and take rents and pay taxes, holding thus for the benefit of both. Thus an indispensable element to constitute ouster of one joint tenant by another is absent in this case, namely, notice or knowledge of adverse claim; on the contrary the bill states acts showing an assurance by Bachman to Reed of continued joint ownership. There was in fact no adverse claim to call for notice.

In view of what has been said, there being no adverse claim under the deeds taken by Bachman from the purchasers under the deeds of trust, and no notice of adverse claim, but, on the contrary, a disavowal of adverse claim under them by Bachman, it is hardly necessary to advert to the principle that when one joint tenant purchases an outstanding title to the common property, he cannot set it up against his cotenant, because the law makes the purchase for the benefit of the common title. This is spoken by many decisions. In *Parker* v. *Brast*, 45 W. Va. 399, it is held that where a cotenant permits the common property to be sold for taxes, and directly or indirectly secures the title in his own name, his deed will be avoided at the instance of his cotenant, or he will be held to be a trustee holding the title for their mutual benefit. The late case of *Clark* v. *Beard*, 59 W. Va. 669, so holds. For that additional reason Bachman cannot set up a claim under those deeds, nor can his heirs. His heirs hold as he held; they hold under his contract of 1884, bound by it. *Gilchrist* v. *Beswick*, 33 W. Va. 168; 30 *Id.* 716; *Forer* v. *Forer*, 29 Grat. 134; 17 Amer. & Eng. Ency. L, (2d Ed.) 676.

But it is said that the creditor under one of those deeds of trust for purchase money made in 1870 released the lien of such deed as to Bachman's interest, and that would justify Bachman's acquirement of the title sold under the deed of trust. Plainly this is not so. The debt was common to all the joint tenants; they all owed it; the land was the common property of all. What part of the land did that release refer to? What two-fifths? Not simply Bachman's. It only released the *lien* as to two-fifths of the entire tract, not any particular two-fifths. Why so? Because they were joint tenants. One of the unities of joint tenants is unity of title. Both Bachman and Reed held title. Another unity

is that of possession.	"Joint tenants are said to be seised *per my et per tout*, by the *half* or *moiety*, and by *all;* that is, they each of them have the entire possession, as well of every *parcel* as of the *whole*.	They have not, one of them a seisin of one half or moiety, and the other of the other moiety; neither can one be exclusively seised of one acre, and his companion of another; but each has an undivided moiety of the whole, and not the whole of an undivided moiety." 2 Blackstone's Commentaries, 182.	Reed had in law possession of every inch and every acre, and Bachman had possession of the self same inch and acre.	The release did not break the unities.	It did not cease the joint tenancy.	After it that joint tenancy remained the same as before.	Hence, Bachman could not so purchase, as a stranger could, and get rid of the rule that purchase by one joint tenant of an adverse claim affecting the common property, enures to the benefit of all.	And that release was for the benefit of all.	It was only a release, not a deed conveying title to Bachman.	Reed's interest yet continues in the interests released.

It cannot be said that Reed to get the benefit of Bachman's purchase must contribute to its cost.	Bachman made no such demand in his interview with Reed in 1884.	Besides Bachman had money in his pocket, derived from the land, belonging to Reed to reimburse his outlay.	Furthermore, before Reed could be said to have abandoned the benefit of the purchase it must appear, not only that he knew of it, but knew of "an adverse claim set up by his co-tenant.	He may reasonably presume that the purchase was to support, not defeat, the common title." *Cecil* v. *Clark*, 44 W. Va. 660.	He may be in debt for contribution, but the purchase does not constitute ouster and hostile possession.	And for whose debt were the deed of trust sales made?	Bachman's.	Reed had paid his share of the debts, Bachman none.	The idea is not to be tolerated that Bachman could hold against Reed under a sale made for Bachman's debt.	He caused the sale by his non-payment of his own debt.	Could he in a court of equity take advantage of his own wrong?	Reed could say "I did not cause the sale, you did."	Freeman on Cotenancy, section 158, says that where the cotenant purchasing at a sale is himself in default for not

making payment there is no doubt that his purchase cannot be enforced against his companion, except for fair contribution. Purchase at a tax sale by one under duty to pay the taxes, is only payment. The purchaser gets no estate against the owner. *Williamson* v. *Russell*, 18 W. Va. 613.

And then there is another consideration repelling adverse claim to Bachman on the title acquired under the deed of trust sales. It has been a question whether a purchase by one joint tenant of the entire property, and entry into possession under it, is an ouster; but all admit that "a conveyance alone, without possession taken under it can never amount to an ouster." Freeman, Cotenancy, section 226. So holds *Hannon* v. *Hannah*, 9 Grat. 146. Now, Bachman never made any fresh entry under these deeds, but simply continued on as before. And moreover, he did not purchase the whole, but only an undivided interest, and being owner of other interests he would be presumed in law, if he had for the first time entered after his purchases, to have entered under his own former interests. *Martin* v. *Thomas*, 56 W. Va. 220; *Prescott* v. *Neavers*, 4 Mason C. C. 330; *Culler* v. *Motzer*, 13 Serg. & R., 359. But why speak of this when Bachman was already in possession and took no new possession after his deeds? It is like the doctrine of part performance under oral contract. The purchaser's possession must be clearly under and in execution of the contract. No prior possession will do. Putting a tax deed for the whole tract on record is no ouster of a cotenant unless he knows of the adverse claim. *Cocks* v. *Simmons*, 29 Am. St. 28. In this connection I will remark that any purchasers or lessees under Bachman or his heirs would likewise be bound by the rule that when Bachman purchased from the purchasers under the trust deeds he purchased for the benefit of the common title. Every one must look back and notice things in the chain of title under which he acquires. *Williamson* v. *Jones*, 43 W. Va. 562. The original deed showed that it was a joint tenancy and the deeds of trust were made by joint tenants, and Bachman's title under purchases under the deeds of trust came from that source, and persons acquiring rights under Bachman must know the law, and it would constitute notice of the rights of a

cotenant. For these reasons, there can be nothing in the claim that Reed is barred by the statute of limitation. And it does not appear from the bill that they were complete purchasers or how they became such purchasers, whether by oral or written executory contract, or by deed of conveyance.

*Laches and staleness of demand.* Manifestly this defense does not apply to the case. If Reed's right is not lost by the statute, it is not lost by *laches. Waldron* v. *Harvey,* 54 W. Va. 608. But I have said that *laches* has no application in this case. Why? Because Reed was a joint tenant with Bachman. We have seen from law quoted above that the possession of one joint tenant is the possession of another, and that no mere silent possession by one for any length of time will alone devest the right of a brother tenant; that brother tenant may be in any part of this earth distant from the land, and he may repose in silence and confidence that his fellow's occupation will not destroy his right. He may assume this and sleep in composure. It is for the occupying tenant to let him know that he claims in hostility. The burden of showing this rests on him. Diligence is not required of the absent brother. Where there is a deed procured by fraud and mistake, for instance, diligence after notice is required, and suit must soon be brought; but not so as to joint tenants. That brother is put by the law under no duty of inquiry or diligence. If he chooses to let a cotenant retain possession and take the profits, he can do so. He is guilty of no negligence if he does not inquire. He may sleep in restful confidence of the good faith of his cotenant under the law of cotenancy. A cotenant cannot lose his right by mere silence. That does not show acquiescence in loss of his estate. *Justice* v. *Lawson,* 46 W. Va. 163.

It is suggested that there is no jurisdiction in equity; but I do not think it is seriously suggested. This is a suit for partition. Secondly, it is a suit by one joint tenant against another and those acting under him for an account of rents and profits, and it is very well settled that one cotenant can go into equity to make another cotenant liable for taking more than his share of the profits while occupying the whole of the common property. *Rust* v. *Rust,* 17 W. Va. 901. And

a person who has without lawful right, under one cotenant, taken oil may be held accountable therefor in equity. *Williamson* v. *Jones*, 43 W. Va. 562. There is no question of equity jurisdiction.

Our decision is to reverse the decree, overrule the demurrers to the bill, and remand the case with leave to answer, and for further proceedings.

## On Rehearing.

A petition for rehearing, while admitting the correctness of the above opinion as between Reed and Bachman, complains of it as between Reed and the oil lessees under Bachman. I answer at once that this concession logically yields the case. But let us go to the petition. It complains of that passage in the opinion that purchasers or lessees under Bachman or his heirs would be bound by the rule, that when Bachman purchased from the purchasers under the trust deeds he purchased for the common title. First, the petition says it was not necessary to the decision. Did not these oil lessees demur? Thereby they said that the bill contained no call for relief against them. The counsel say in argument that no relief can be given because their clients are innocent purchasers. They thus demand decision of this point. The facts as to this question appear in the bill and exhibits. This plainly called for decision of their cases. We had to say whether the bill showed in its facts and exhibits notice to them of Reed's rights; for if it did, they had not that defence; but if it did not, their defence would be good. So, I cannot see why this matter was not involved in the decision.

Then, is the proposition of law above stated sound? The petition suggests that authority does not support it. The record shows that the land was conveyed originally to four joint tenants; they made a deed of trust for its purchase price to Hall, trustee, on the whole tract. Two of them, Bachman and Reed, made a deed of trust on the share they bought from Reeves for its purchase price. Sales were made under those deeds of trust to Cain and Doutt, and those purchasers conveyed their purchases to Bachman. He thus bought in shares under incumbrances created by Bach-

man and Reed, a common joint incumbrance.    That is,
Bachman simply removed an incumbrance on the joint estate.
The deeds from the trustee declared that the land was the same
originally conveyed to the four joint tenants.    So did
the deeds of trust.    Now, a purchaser or lessee must look
back through the title papers by which land comes, and is ·
held to have notice of all facts appearing in them.  Whether
he reads them or not, he is affected with such notice; actual,
if he reads them; constructive, if he does not read them.
Hogg's Eq. Principles, 488; *Morris* v. *Terrell*, 2 Rand. 6;
*Graff* v. *Castleman*, 5 *Id.* 207; *Burwell* v. *Fauber*, 21
Grat. p. 463; 23 Am. & Eng. Ency. L. (2d Ed.) 508.    And
such constructive notice is just as effective in law as actual
notice.    21 Am. & Eng. Ency. L. (2d Ed.) 582; *Cain* v.
*Cox*, 23 W. Va. 609.    In addition, the law charges the pur-
chaser with notice; not merely of facts on the face of the
title papers, but also with notice of those facts which they
suggest for prudent inquiry.    As the opinion in *French* v.
*Loyal Co.*, 5 Leigh, p. 643, says, "they (the cases) show
that wherever ordinary prudence would suggest an inquiry,
notice is imputed by law, and the party is charged with
everything of which the strictest inquiry would have put
him in possession."    The Court said in *Cain* v. *Cox*, 23 W.
Va. p. 609, "It is now considered everywhere that the set-
tled doctrine in equity is, that what is considered as suffi-
cient to put a person on inquiry is considered as conveying
notice; for the law imputes to a person knowledge of a
fact, of which the exercise of common prudence and ordi-
nary diligence must have apprised him."    21 Am. & Eng.
Ency. L. (2d Ed.) 584.    See *Lamar* v. *Hale*, 79 Va. 147.  "A
purchaser of the common property from such cotenant, with
notice of the character of his title, will be limited in his
holding to the actual interest of his grantor in such proper-
ty."    *Parker* v. *Brast*, 45 W. Va. 399.    See Hogg's Eq.
Principles, 487-88.    The purchaser "is bound not only by
*actual*, but also by constructive notice, which is the same in
effect as actual notice.    He must look to the title papers
under which he buys, and is charged with notice of all the
facts appearing upon their face, *or to the knowledge of
which anything there appearing will conduct him.*    He has
no right to shut his eyes or ears to the inlet of information,

and then say he is a *bona fide* purchaser without notice."
*Wood* v. *Krebs*, 30 Grat. p. 715. "Means of knowledge,
with the duty of using them are,' in equity, equivalent to
knowledge itself." *Cordova* v. *Hood*, 17 Wall. 1. *Price* v.
*McDonald*, 54 Am. Dec. 657, strongly supports this posi-
tion. Now, under these principles what is the right of
which the title papers would impute knowledge to those
purchasing or leasing from Bachman's heirs? The right of
Reed to treat Bachman's title acquired from Cain and Doutt
by their purchases under the trust sales as acquired for their
joint benefit, not as an adverse claim; the right of Reed to
regard it as a mere removal of the incumbrance created by
the deeds of trust on the joint property; an incumbrance
made by both on a joint estate, both responsible for it. The
law gave Reed right to so regard Bachman's purchase, and
those acquiring from Bachman or his heirs were bound to
know this law. *Yock* v. *Mann*, 57 W. Va. 187; *Haymond* v.
*Camden*, 48 *Id.* 463. The title papers told them that the
land was joint estate. The original deed so declared. The
deeds of trust said so. The trustee's deed said so. Such
purchasers were warned of the fact, and it was their duty
to inquire of Reed whether he still claimed or had renounced
his right, because there was the proper source of informa-
tion. They were bound to take notice of the law giving
Reed this right, and to inquire whether he yet claimed it.
They purchased at their hazard. The title papers told them
of his right, and in the strongest way called on the pur-
chasers to see whether it had been extinguished. Reed was
not bound to notify them of his right. They must inquire
as to that right. This right of Reed's was not required by law
to be recorded. He had nothing which any statute required
to be recorded, in addition to the recorded deeds. Except
where a statute requires a deed or notice or other thing to be
recorded, there is no obligation to record. It is questioned
by the rehearing petition whether this right of Reed to
treat Bachman's purchase as one for the joint benefit was
such an one called for inquiry, or was notified, as it was *de-
hors* the papers. The general principles stated above answer
that question; but the case of *Gibson* v. *Winslow*, 46 Pa. St.
380, 84 Am. Dec. 552, distinctly meets the precise point,
holding that 'Where land owned jointly by three persons is

purchased at a sheriff's sale by one of them, on an execution against all, the buyer cannot set up his purchase adversely to them; he can, at most, only hold the former interests of his cotenants as their trustee. Whatever will put a purchaser upon inquiry, and lead to knowledge, is notice. He is bound to make inquiry where there is anything that would lead to a prudent man to make it, and he is therefore presumed to have known all that inquiry would have revealed to him. Where land owned jointly by three persons is sold on execution against them, and is purchased by one of the joint owners, the deed of the sheriff carries with it notice that the land has been sold on execution, as the property of three joint owners, and purchased by one of them, and that the title of the other joint owners remained in them. Therefore, no subsequent vendee can be treated as a purchaser without notice." *Parker* v. *Brast*, 45 W. Va. 399, is pointed authority to show that purchasers under Bachman must know that his purchase was for all. It makes no difference that Bachman did not himself buy at the trust sales. He got in the title sold, and the moment he got it, it was the same title and affected by the same cast of joint tenancy and trust as before. 17 Am. & Eng. Ency. L. (2d Ed.) 676. In *Parker* v. *Brast*, cited, one joint tenant permitted the joint property to be sold for taxes, as Bachman in this case permitted, indeed, as the bill charges, caused the joint property to be sold for a joint debt, and a stranger purchased at the tax sale, as in this case, and then conveyed to the joint tenant failing to pay taxes, as in this case the purchasers conveyed to Bachman, who failed to pay the debt. The court said that the purchase by the joint tenant, though from a stranger to the title, was a purchase for the common benefit of all the joint owners. Point 1 in that case reads thus: " Where a cotenant permits the common property to be sold for taxes, and directly or indirectly secures the title in his own name, his deed will be avoided at the instance of his cotenant, or he will be held to be a trustee holding the legal title for their mutual benefit." In that case, too, it was distinctly held that when Brast purchased from Lanck, a joint tenant, who bought from the tax purchaser, Brast was affected with notice that Lanck was a joint tenant, and that his purchase was only a redemption from the tax sale for the

benefit of all the owners. The case of *Parker* v. *Brast* is almost identical with and rules this case. I assert that it supports the reasoning above, and is itself supported by authorities above cited.

It cannot be said as Doutt, a stranger, purchased at the trust sale and conveyed three fifths to Bachman, the case is different from what would be the case if Bachman had himself purchased under the trust sale. Did not Doutt, by such purchase, himself become only a tenant in common with Reed and Bachman?

Doutt purchased an undivided, I say undivided interest, and thus was a tenant in common, and being such, Bachman acquiring the three fifths from Doutt has the same character as Doutt, that is, a tenant in common. ·

I do not question the law proposition that when once a joint tenancy or in common has ceased and ended—when the parties are no longer cotenants—one of them may purchase an outstanding title; but in this case that doctrine does not apply, because the cotenancy never ceased for a moment, and exists to-day. Why? When Bachman obtained the release of two-fifths, he released an undivided two-fifths and simply lifted the deed of trust from the two-fifths in which Bachman and Reed were cotenants. The release could not enure to Bachman's sole interest; it simply left them cotenants in such fifths; it did not convey the fifths to Bachman alone. When Bachman acquired the Reeves interest Reed and he were cotenants, because the tracts had never been divided, and when Doutt released the two-fifths, Reed and Bachman still owned the two-fifths together. So Bachman's acquiring the Reeves interest was for joint benefit. So with Bachman's acquirement of the three-fifths under the second trust sale. The joint ownership was not severed by the sale of the Reeves fifth, nor by the sale of three-fifths under the second trust sale. Furthermore, note, that the original conveyance of the whole tract was to Bachman, Reed, Reno and Reeves. Each taking one fourth, undivided. When the sales under the deeds of trust were made the sales were of fifths, not fourths, it being supposed that Swope had an interest. But Swope had no interest. The legal title was in four, and the sales under the trusts being of fifths, not fourths, there remained in the four cotenants an undi-

vided interest represented by the difference between fourths and fifths, that is one-twentieth, not touched by the sales under the deeds of trust, that is one-twentieth in each co-tenant. This is another reason why the cotenancy still existed after the sales under the deeds of trust, and, therefore, when Bachman acquired interests sold under the deeds of trust he acquired them for the benefit of his co-tenant, Reed, because the cotenancy had never for a moment ceased.

It is hardly necessary to say that this decision does not touch the rights of purchasers or lessees of Bachman's heirs arising from any adverse possession by them after the beginning of their rights. When their rights began, just how, or under what circumstances does not appear in the bill, so as to enable us to pass on that statute as to them.

The bill states facts from which the question arises whether the lessees were affected with notice, and to raise the question of *laches*; but it does not give the date of the lessees' possession, or whether they had deeds or not for color of title. Another reason why the claim of innocent purchasers cannot prevail is, that it does not appear from the bill that the parties are purchasers for valuable consideration paid and complete title.

                                                                *Reversed.*