# CHARLESTON.

SOMMERS *et als.* v. BENNETT *et als.*

Submitted March 30, 1910.   Decided November 15, 1910.

1.  TENANCY IN COMMON—*Trust—Possession by Co-Tenant or Trustee.*

    A case in which the rules and principles announced in *Gapen* v. *Gapen*, 41 W. Va. 422; *Cecil* v. *Clark*, 44 W. Va. 659; *Parker* v. *Brast*, 45 W. Va. 399; *Justice* v. *Lawson*, 46 W. Va. 163; *Cochran* v. *Cochran*, 55 W. Va. 178; *Reed* v. *Bachman*, 61 W. Va. 452; and *Russell* v. *Tennant*, 63 W. Va. 623, governing where title to land is claimed by one co-tenant against another, or by a trustee of an express trust against his *cestui que trust*, by reason of his purchase of the land at a tax sale, and of outstanding or conflicting titles thereto, and by occupation, improvements, and the taking and appropriating to his exclusive use of the rents, issues and profits, are properly applicable.

2. LIMITATION OF ACTIONS—*Suit for Accounting by Co-Tenant.*

   In a suit by one co-tenant against another co-tenant of land acquired and held for sale and profit, for an accounting of the proceeds of sales made, and of rents, issues and profits, the statute of limitations begins to run from the time plaintiff had right to demand payment.

3. TENANCY IN COMMON—*Accounting—Scope.*

   Where land so held has been leased for oil and gas purposes by a co-tenant or trustee, without the consent of the other co-tenant or the *cestui que trust*, but such lease is subsequently ratified in a suit for an accounting of rents and profits, the accounting should include all money received by the lessor, co-tenant or trustee for such lease, by way of bonus money, or commutation money, and from royalty oils and gas rentals, or otherwise, accruing under such lease.

(BRANNON, JUDGE, absent.)

Appeal from Circuit Court, Marion County.

Bill by Martha M. Sommers and others against William G. Bennett and others. Judgment for defendants, and plaintiffs appeal.

*Reversed and Remanded, With Directions.*

*Linn & Hamilton,* for appellants.

*W. Mollohan* and *Louis Bennett,* for appellees.

MILLER, JUDGE:

Plaintiffs, as heirs of Gideon D. Camden, deceased, seek by their bill to establish their right and title to one fourth of the residue of four several tracts of land, originally, in 1844, patented to one John Walden, but the legal title to which, for several years prior to his death, had been acquired by Jonathan M. Bennett, and since then held by his heirs and devisees; and also for an accounting by said defendants of the rents and profits, and of the proceeds of the sales of various parts thereof, and for general relief.

By contract between Walden and Camden of August 4, 1843, it is recited that Walden had furnished Camden treasury warrant No. 15097, calling for nine thousand nine hundred and ninety acres, and that it was understood that said warrant, and any other warrants Walden might thereafter furnish Camden, should be located upon such lands as Camden might deem most

advisable. The contract also authorized Camden to contract with such persons as he might think proper, to survey and carry the lands into grant in such number of tracts as he might consider most advisable, stipulating, however, that for the expenses of surveying and patenting such lands such persons should be entitled to one moiety thereof, Walden to make quit-claim deeds to them therefor. Said contract also stipulated that for Camden's services Walden should convey to him, by quit-claim deed, an equal one half of the other moiety of said lands, with the provision that such moiety should be subject to the costs of the land warrants, which should be paid Walden out of the first sales made.

By deed of May 27, 1873, Walden conveyed to said Bennett a three fourths undivided interest in said lands, for the money consideration recited therein, and in consideration of a contract of August 10, 1843, being the contract made with Bennett by Camden pursuant to his contract with Walden, for surveying and patenting said lands, whereby Bennett became invested with the legal title, not only to the moiety provided for in said contract, but also to the one half of the other moiety which had been held by Walden for himself and Camden.

One of said tracts, a tract of 1800 acres in Gilmer county, except 181 acres thereof, which by contract in 1869, had been sold to and by deed of Walden, Bennett and Camden of June 20, 1873, had been conveyed to one Vannoy, was for the years 1871 and 1873, returned delinquent, in the name of Walden, was sold in 1875 for the taxes of those years as a tract of 1619 acres, purchased by Bennett and by deed of December 11, 1876, was conveyed to him by the clerk of the county court of Gilmer county. This land, however, except a reservation of the oil and gas in 145 acres thereof, conveyed by the executors of J. M. Bennett to Ruth Hinzman, May 2, 1895, had all been disposed of prior to the institution of this suit, but the facts recited and other facts in relation thereto are relied upon by both sides as evidential facts on the subject of the present controversy.

Of said tracts a tract of 500 acres and one of 1,000 acres on Spring Fork of Yellow Creek in Calhoun county, after being assessed in the names of Bennett and Walden were allowed to be returned delinquent for non-payment of taxes for the year 1874, and in 1875 were sold by the sheriff, and purchased by

the state, and in proceedings by the commissioner of school lands of that county the same were, November 7, 1877, decreed to be sold, and October 22, 1878, were sold, and at which sale Bennett became the purchaser, and, April 7, 1880, obtained a deed therefor from the commissioner of school lands. The title thus acquired to these tracts has remained in Bennett, his heirs and devisees, except such portions thereof as were subsequently sold and conveyed by Camden and Bennett, or by Bennett, or his heirs and devisees. But there were conflicting titles to portions thereof, and some small tracts contracted by Bennett or Bennett and Camden though held in possession by the purchasers had not been paid for. Since the death of Bennett, conflicting titles have been settled or compromised, and some of the tracts sold have been recovered, the purchasers either surrendering the same or releasing and reconveying the land to the heirs and devisees of Bennett; so that at the time of the institution of this suit there had become invested in them by devise and by re-purchase of tracts sold and settlement and purchase of conflicting titles, an aggregate of about 700 acres; this is the land in which plaintiffs claim a one fourth undivided interest.

That Bennett knew of and recognized Camden's interest in the land at all times there is no room for doubt. The same contract of August 4, 1843, that authorized Camden to make the contract with Bennett of August 10, 1843, provided for Camden's one fourth interest in said lands. Their deeds and contracts relating to the land, and letters written by Bennett to Camden all attest mutual knowledge and understanding of their respective rights and interests and good faith in respecting them. Besides, the record shows that on August 26, 1876, Walden, residing in Virginia, and who had become financially embarassed, executed a deed of trust to one Gray, for the benefit of his creditors, which was recorded in Lewis, Gilmer and Calhoun counties; whereby among other lands he conveyed to Gray as trustee such right as he had in the lands in controversy, and in which he declared the equitable title to the one fourth undivided interest held by him to belong to said Camden, the legal title remaining in him only to await a settlement of the accounts between him and Camden. The record shows that in a suit of *Lewis, and others, Creditors* v. *Walden, and others,*

in Lewis county, the commissioner, to whom the cause was referred, reported in 1896, some $3,744.41 due Camden's estate, and $1,031.93 due Walden on account of the sales of land made, with some 1100 acres still remaining unsold. This report, it seems, has never been acted upon however.

Bennett died in 1887, Camden in 1891. The twain, the record shows, had been great friends for many years. Many of their transactions relating to these lands, prior to the death of Bennett, are covered by deeds and contracts of Walden and Camden, and of Bennett and Camden acting jointly. But, with one or two exceptions, after Bennett obtained the deed from the commissioner of school lands in 1880, deeds were made by Bennett individually. But subsequent to the date of this deed Bennett recognized the rights of Camden in these lands, not only by letters written to Camden, but a notable instance thereof is in answers prepared by him as attorney for himself and Camden and filed in a suit of *Zumbro & Smith* v. *Jeffreys et als.* His answer to the original bill was filed in 1885, and the joint answer of himself and Camden to an amended bill was filed in 1886. In his answers to the original bill Bennett admits that he purchased these lands at the tax sale, subject to any claim or demand the said Walden had thereto; and in a letter to Camden, May 2, 1886, Bennett advises him of the filing of said joint answers. In January, 1877, Bennett in reply to a letter from him on the subject, wrote Camden respecting the taxes on the Walden lands, corrected a wrong impression which he seems to have had as to which of the Walden tracts it was that Bennett had purchased for taxes, and said: "I understand you to desire that one fourth of the Walden land should be returned delinquent." November 4, 1875, Bennett wrote Camden, "I bought in the Walden lands for taxes at the last sales, whereby I can secure to you, your interest." In February 3, 1877, he wrote Camden, among other things: "You are on the wrong track of the Walden lands. It is the 1800 acre tract not the 1300 acre tract.". And as late as August 22, 1887, he wrote: "Come up the first of next week when I expect to be back from Braxton, and we will give a definite time to the forfeiture question, and I want also to apportion the sales between us." Other letters of his, in evidence, tend to show Bennett's acknowledgment of Camden's interest in these lands. It does

not definitely appear from the last letter quoted that the references there to forfeiture and apportionment of sales refer to the Walden land. The letters from Camden to Bennett on this subject are not produced by defendants, although some of Bennett's letters to Camden are answers to letters from Camden to him, a fact which is not without significance.

The defenses now interposed by the executors and devisees of Bennett are abandonment, laches and the statute of limitations. It is said that neither Camden, who survived Bennett more than three years, nor his heirs or devisees, since his death, took any steps by legal process or otherwise against Bennett in his life time, or against his executors and devisees after his death to establish his or their alleged right, title and interest to these lands, until the institution of this suit in 1902.

The virtue of the defenses depends largely upon the relationship in which Bennett stood towards Walden and Camden, before and after acquiring these tax title, and particularly the title to the land in controversy, acquired by the deed from the school commissioner in April, 1880. Prior to that deed the land was taxed jointly in the names of Bennett and Walden, and the title was in Bennett and Walden jointly in the proportions of three fourths interest in Bennett and one fourth to Walden, Walden holding one fourth in trust for Camden. Bennett, Camden and Walden were therefore co-tenants. The purchase by Bennett and the deed to him from the commissioner of school lands did not destroy the rights and interests of either Walden or Camden in the land, and the record plainly shows that such was not the intention of Bennett, so far at least as the rights of his friend Camden were concerned. In Bennett's letter to Camden of January, 1877, Bennett said with reference to the 1900 acre tract: "I bought the whole tract for subsequent taxes, and have obtained a deed for it according to our understanding." And as we have seen in his answer in the *Zumbro & Smith Case,* he acknowledged the rights of Walden, which meant Camden's rights. Conceding the proposition that Bennett by the tax deed acquired the legal title to the land, he must be regarded as having taken and held the title to the one fourth interest therein in trust for Camden. But if the relation of co-tenant between them had not subsisted, would not the letters to Camden, written before and subsequent

to the sale and purchase by Bennett of the land for taxes, amount to a declaration of trust in favor of Camden? In *Mc-Candless* v. *Warner,* 26 W. Va. 754, a series of letters written to a third person after creation of the trust, no one of which of itself perhaps was sufficient, but which taken together disclosed the trust and the terms thereof, were held to be a sufficient declaration of the trust to bind the trustee, and to establish the trust in him. Whether we say then that Bennett stood in the relation of co-tenant or trustee to Walden or to Camden the rights and liabilities of the parties with which we. have to deal in this suit are practically the same.

How may one co-tenant or trustee acquire the interest of another with whom he stands in this relationship of trust and confidence? First, title may be acquired by abandonment. This is one of the defenses. What evidence is there of abandonment by Camden? First it is said he allowed the land to be sold and purchased by Bennett in 1880, and that he thereafter permitted Bennett, without objection, to deal with the land as his own, contributing nothing to the payment of the taxes, and had never called upon Bennett for a settlement; that he made oral declarations to the witnesses Wilson and Taylor, purchasers of portions of the land, and to defendant Louis Bennett that he had no longer any interest in the land. The evidence of Louis Bennett is clearly inadmissible, and was properly excluded by the court below. True it is that Bennett purchased the land for taxes, but what of this? Whether with or without the consent of Camden his purchase as co-tenant or trustee amounted simply to a redemption of the land; for both were bound for the taxes, and payment by one or both amounted simply to the payment of their own obligations. Besides, the letters of Bennett to Camden, already referred to, establish beyond doubt that Bennett's purchase was not in hostility to the rights and claims of Camden, his friend of many years, but rather with the hope of protecting Camden's equitable title to the quarter interest therein. The legal title thereto up to that time remained in Walden. That such were the purposes of both Bennett and Camden we think fully appears from Bennett's letter of 1877. Why should Camden have abandoned this land in 1880, when Bennett acquired the tax deed? On suggestion of the defendants is, that inasmuch as he had not acquired the legal title before the

claims of creditors of Walden were asserted, he had concluded
to let the land go so as to avoid a clash with creditors. But
does not the letter of Bennett referred to negative this idea?
Besides we find Camden, a party to the suit of *Lewis* v. *Walden,*
contesting the rights of these creditors to this land; and the
declaration of Walden in his deed of trust to Gray in 1876,
declares Camden's interest in the land, and subordinates the
claims of his creditors to the rights of Camden; and as late
as August 22, 1887, we find Bennett, in his letter to Camden,
.referring to the question of forfeiture, and to an apportionment
of sales between them. True we cannot say certainly that the
apportionment of sales here referred to has reference to the
Walden lands. But why not these lands as well as any others?
The report of the commissioner in the Lewis-Walden suit, as
we have seen shows Walden indebted to Camden, not Camden
to Walden, on account of sales of these lands. Another sug-
gestion of defendants is that Camden may have concluded to
abandon any further claim to the lands because of the fact that
at the time Bennett obtained his deed from Walden in 1873,
much of the land had been sold, or sold and conveyed by Walden,
or by ·Camden his attorney in fact, and that not more than
enough remained to give Bennett his share of the land. But
we find that Bennett at the time he took this deed from Walden
got a three fourth interest instead of a one half interest to which
he was originally entitled and actually executed his note to
Walden for $1,582.00 for Walden's quarter interest. · Besides,
what evidence is there that Bennett had not shared with Walden
and Camden in the distribution of the proceeds of all prior
sales? Absolutely none. We cannot assume that Camden
representing Walden and himself, and knowing of Bennett's
interest, was not as faithful to Bennett and his interests, as the
evidence shows Bennett was faithful to him and his interests.
There seems to have been absolute fairness between all three
parties, so long as they lived. They trusted each other im-
plicitly, and though Walden became involved financially, yet
he endeavored in his deed to Gray to preserve the rights of
Camden. These dealings between the parties are entirely in-
consistent with the notion of abandonment by Camden.

But what of the alleged declarations of Camden to Wilson
and to Taylor? Can we say that, if made, they are to over-

come the evidential force of acts, contracts and dealings of the parties just referred to, and which are wholly inconsistent with the idea or claim of abandonment? Camden joined with Bennett in the deed to Wilson after his alleged declarations to Wilson; and long afterwards both Camden and Bennett filed answers in the *Zumbro-Smith Case.* After so many years and after the death of declarent it would be a dangerous precedent to allow evidence of such declarations to destroy property rights. Those declarations were not wholly inconsistent with the rights and interests of Camden. He knew that Bennett held or claimed to hold the legal title for himself and Camden—had been making contracts and deeds for parts of the land, and therein representing himself and Camden, and it was perfectly natural that Camden should have turned these persons over to Bennett, as they say he did.

But it is said the failure of Camden before his death; and the long delay of his heirs and devisees since then to call for or bring proceedings for a settlement, and to have his or their interests in the land established, and for an accounting, evinces the purpose to abandon any claim to the land. So far as the suggestion relates to Camden we do not know from the record or otherwise but that a settlement on account of sales may have been had between him and Bennett. And why should Camden have called on Bennett for the legal title? The record shows that the Walden lands had been from the beginning acquired and held for speculation, sale and profit. Camden had these letters from Bennett showing how Bennett held the title for himself and Camden, and we do not think, under these circumstances, that want of evidence showing failure of Camden to call for the legal title or a settlement is sufficient evidence of abandonment.

There is no claim of abandonment by the heirs of Camden. They say they had not discovered their rights until shortly before the bringing of this suit. True there is a suggestion by defendants that the bringing of this suit was inspired by discovery of oil and gas in paying quantities, and that but for this fact the suit would not have been brought; and that inasmuch as these heirs waited for about eleven years after the death of Camden, and seven years after their right to bring suit had been determined, they ought to be regarded as having abondoned any

claim they might otherwise have had to the land. But what reason was there for supposing they had abandoned a claim to several hundred acres of land?

The evidence shows that the executors of Bennett were quite active after the death of their ancestor in looking after and preserving the lands left them. They may not have had actual knowledge of the rights of Camden, but they were as much charged with notice of Camden's rights by the record, and by the documentary evidences in their possession, as they would have the heirs of Camden charged therewith; and having succeeded to the rights of Bennett as co-tenant or trustee for himself and Camden, they were as much bound as their ancestor to execute faithfully the trust descended or devised to them.

Camden left a will, which was contested by plaintiffs, and by which, except as to certain small specific legacies, he undertook to devise all his property, real and personal, to his wife. The contest continued from 1891 to 1895, when a compromise was effected, under which the will was probated as the will of Camden, and which provided that upon the payment to the widow of a specific sum of money from the proceeds of the sales of property or otherwise, by trustees appointed, and to whom the legal title was conveyed by the widow and the plaintiffs as heirs, the residue of the property should be conveyed to plaintiffs as heirs. The affairs of the estate were thereby left in great confusion. The lands were widely scattered in the different counties of the state, and the titles to many of them were in dispute; and suits were pending and brought in which the estate was involved. The papers relating to the estate were scattered and in great confusion, and the bill alleges that it was not actually discovered by plaintiffs, some of whom lived in other states, that they had any interest in the lands, now sought to be recovered, until a short time before the suit brought. We think the evidence bears out their contentions. True there was the record of the suit of *Lewis* v. *Walden;* there was the deed of trust from Walden to Gray; there was of record the power of attorney from Walden to Camden of 1865; there was the contract of Walden with Camden in 1843, and the letters of Bennett to Camden referred to, but it took time to discover all these records, and to understand their meaning, and comprehend their relation to the particular lands involved here.

The administrator with the will annexed was a lawyer of ability, now a judge of the court. He spent a great deal of time in trying to unravel the tangles of this estate, as did some of the plaintiffs, and other lawyers employed. They did not discover, and were unable to advise plaintiffs of their rights sought to be established here, and we are unable to say from the evidence that the delay of seven years to assert their rights, under the circumstances should be treated as an abandonment thereof.

But are plaintiffs barred by laches and the statute of limitations? These also are set up by way of defense. This question has been frequently before this Court in recent years. Many of our cases, following the universal doctrine, hold that a co-tenant or beneficiary of an express trust will not be barred of his rights of entry by mere laches, by acquiescence, or by lapse of time. The more recent cases in which this general doctrine has been applied and which have reviewed prior decisions and authorities are: *Gapen* v. *Gapen,* 41 W. Va. 422; *Cecil* v. *Clark,* 44 W. Va. 659; *Parker* v. *Brast,* 45 W. Va. 399; *Justice* v. *Lawson,* 46 W. Va. 163; *Cochran* v. *Cochran,* 55 W. Va. 178; *Reed* v. *Bachman,* 61 W. Va. 452; *Russell* v. *Tennant,* 63 W. Va. 623. These decisions unite in holding that until an actual disseisin of a co-tenant has been effected by some notorious act of ouster, brought home to his knowledge by another co-tenant, and, in the case of a beneficiary under a trust, until the duties of the trustee are ended or the trust is disavowed by the trustee, such co-tenant or *cestui que trust* cannot lose his or their rights of entry on land by delay in asserting the same and demanding possession. The rule is different where the rights asserted are mere equitable rights of action, or in the case of resulting trusts. In such cases the defense of laches, and the statute of limitations is applicable, and in some cases a much less period than the statute of limitations will bar recovery. *Cresap* v. *Cresap,* 54 W. Va. 581; *Newman* v. *Newman,* 60 W. Va. 371. The same is true in cases of fraud, relied upon as ground of relief. *Lafferty,* v. *Lafferty,* 42 W. Va. 783. Such is the rule also where the rights of third parties have intervened and one has stood by and allowed another to deal with the property inconsistently with his rights and makes no objection thereto. *Despard* v. *Despard,* 53 W. Va. 443. But the case we have here is that of one co-tenant, or the trustees of an express trust,

asserting title against another co-tenant, or beneficiary of the trust by reason of 'laches and limitation. To acquire title in this way requires actual notorious ouster of the co-tenant or *cestui que trust,* with actual knowledge brought home to him, and occupation of the land, and appropriation of the rents and profits thereof by the trustee or other co-tenant, to the exclusion of and in a manner inconsistent with the rights and claims of the other.

Defendants claim their case is brought within these rules. Let us examine the facts relied on: First, as based on acts of ouster by J. M. Bennett. It is said that his purchase of the land, and the recordation of his deed in 1880, and possession thereunder, constitute such a notorious act of ouster, and 'which taken in connection with his dealings with the land subsequently as his own, selling and conveying portions of it and taking the proceeds of the sale, and the rents and profits thereof with the acquiescence of Walden or Walden and Camden, were so wholly inconsistent with the rights of Camden or of his heirs, and continued so long as to bar them of recovery. But were they? The letters of Bennett, and his declarations thereafter in solemn court papers negative every such claim of ouster, and adverse holding. Of the cases cited, *Cecil* v. *Clark,* and *Parker* v. *Brast* hold that such purchase by one co-tenant, of land owned in common, is but a redemption, and inures to the benefit of his co-tenant. And all the cases cited propound the proposition that the acquisition by one co-tenant of any interest in or claim to or lien upon the common property will inure to the benefit of the other, and be regarded as held in trust for him. Bennett had no more possession after the tax deed, and up to the time of his death, so far as the record shows, than he had prior to the deed. There is nothing in this record to show that he took to himself rents and profits or the proceeds of the sales of land, without having accounted therefor to his co-tenant. Indeed all of his letters and his declarations referred to, contradict the claims of defendants to the contrary.

But the executors and devisees of Bennett say that whatever effect be given to the acts of possession and dealings with the land, that their possession and improvements thereof, and their taking of the rents and profits since his death have continued for a sufficient length of time to completely divest plaintiffs,

by laches and the statute of limitations, of all right and title
to said land, if any they ever had. Let us see what the record
discloses on this subject. We must remember that whatever
title these devisees have they took by the will of their father,
and that it came to them burdened with the subsisting rights
of Walden and Camden thereto, disclosed by the record. They
succeeded only to such possession of the land as their father had
at the time of his death. We find in the record no competent
evidence of anything done by them or either of them to give
notice to Camden or to his heirs that they held the land in any
other capacity, or by the assertion of any different title or claim
than that which became invested in them as devisees. True the
record does show that the executors found outstanding contracts
and deeds for portions of the land, and some adverse claims to
portions of the land; that they settled and compromised and
bought out some of these conflicting claimants; that they caused
other portions to be sold for purchase money and purchased
the same at judicial sales thereof, taking title in themselves
individually; and in one or two instances the record shows they
caused re-conveyances to be made to them by former purchasers
in consideration of the purchase money due. They sold some
of the land and made deeds for the same. Some of these deeds
by which defendants acquired title were obtained since the
institution of this suit, and one or more of them shortly before
the suit was brought. One transaction upon which much re-
liance is placed is a lease made by Bennett to Benjamin Taylor,
April 20, 1895, of a tract described as 1,000 acres on Yellow
Creek in Calhoun county, subject to prior leases to other parties.
Another is a lease, made May 31, 1901 to P. J. Townsel, of the
land immediately in controversy, for oil and gas purposes. It
is not within the limits of a judicial opinion to refer to all these
transactions, but, under all the circumstances we see nothing
in them inconsistent with the rights claimed by plaintiffs. We
must remember, as said before, that these lands from the begin-
ning were held for sale, barter and profit. The possession and
dealings by defendants with these lands after their father's
death were not materially different from his, and were not of
that character or for the length of time necessary to bar re-
covery by plaintiffs. The decisions of this Court cited hold
that silent possession, the purchase of adverse titles, the taking

of rents and profits, payment of taxes, the making of deeds, even for the whole property, by a co-tenant, and many other acts and dealings of like character will not be sufficient to work an ouster. It is said in *Reed* v. *Bachman, supra,* at page 458: "There must be some overt, open notorious act of a character to indicate an intention of adverse claim, so as to preclude all doubt of the character of his adverse holding, whereas taking profits by one co-tenant in possession is but the exercise of a legal right, subject to an accounting to another for his share. There must be clear, positive, continued disclaimer of his co-tenant's right and an assertion of his own adverse right. And that is not enough. His co-tenant must know of such adverse claim and tortious acts. He is not bound to inquire, because he can repose in confidence of his co-tenant's good faith. That co-tenant must notify him of his adverse claim, or at any rate, he must know of it. * * * * No matter what the acts of one co-tenant may be, whether by taking deed for the whole or by taking rents and profits, or what not. That will not do; for our decisions say with emphasis that such knowledge or notice of hostile claim on the part of the co-tenant must be shown." The decisions cited and those referred to therein it seems to us answer every claim by the defendants of ouster and adverse possession. And in our opinion they have not made good their defense. Upon the whole record we are clearly of opinion that the plaintiffs have established their right to a one fourth undivided interest in the land, and to an accounting for rents and profits.

Having reached this conclusion, the question remains, upon what principles should such accounting be had? As we have said this land was held by Bennett and Camden for sale and profit, and Bennett and his devisees having acquired and held the legal title for these purposes, they had the right of sale and disposition of the property, and to collect the rent, issues and profits thereof. What law of limitation will be applicable then in this branch of the case? Buswell on Limitations and Adverse Possession, section 179, says: "The rule that the limitation begins to run from the time when the cause of action actually accrues applies to suits between co-tenants and co-contractors. Thus in an action for money had and received by one tenant in common against his co-tenant for the proceeds of

trees, sold, the statute begins to run from the time when the party becomes liable to account, that is, from the time of the payment; and if a promissory note be taken from the purchaser, upon which payments are afterwards made, the statute begins to run, as to each payment, from the time of such payment." We think this the correct rule to apply here, and that the accounting for receipts and disbursements from sales and from rents and profits should be limited to the period of five years next before the institution of this suit.

It is suggested, however, that such an accounting should not include an accounting for the bonus money received for leases, executed by defendants, for oil and gas purposes. We do not think they should be limited merely to damages recoverable under section 2, chapter 92, Code, for injury done to the property, and to actual compensation therefor. The bill in this case did not seek to set aside any of the deeds or leases. On the contrary, the plaintiffs proposed to ratify and confirm all such deeds and leases, and particularly the lease of Townsel. They therefore claim the benefit of the contract made by their co-tenants and trustees. The bill specifically mentions this bonus money, and calls for an accounting therefor, and we think upon the rules and principles enunciated in *McNeely* v. *South Penn Oil Co.,* 58 W. Va. 438, they are entitled to have included in said settlements an accounting for all rents and profits, including bonus or commutation money and royalty oils, and gas rentals, if any.

The decree below will therefore be reversed and the decree which the circuit court should have entered will be entered here, adjudging and decreeing plaintiffs to be entitled to a one fourth interest in the land sought to be recovered, and that the defendants hold the same in trust for them. And the cause will be remanded to the circuit court with directions to state and settle the account between plaintiffs and defendants, according to the rules and principles enunciated and directions given herein, and to be further proceeded with therein according to the rules and principles pertaining to a court of equity.

### ON REHEARING.

We conclude that the opinion filed on the former hearing

sufficiently responds to all points presented by counsel on re-hearing, except perhaps as to two of them.

First, it is insisted that we erred in decreeing to plaintiffs any interest in, (1) a tract of 65 acres, conveyed by Bennett and Camden to Benjamin H. Taylor, Trustee, November 9, 1880; (2) a tract of 114 acres sold by Bennett and Camden, through Norris, Agent, November 9, 1877, to W. H. Taylor; and, (3) a tract of 100 acres sold by Bennett to Enoch Cain, March 11, 1874. The contention of appellees is that these tracts were purchased from those vendees, or their assignees, by the devisees of Bennett for full value, subsequently to his death, and the proceeds accounted for by them to his executors, and that the only interest appellants have, if any, is to share in the purchase money. Appellants' counsel say in reply that the facts are not as claimed, that the devisees of Bennett did not in fact purchase said tracts, and pay for them out of their own funds, but that these lands were repurchased or recovered by appellees by surrendering the original purchase money notes taken by Camden and Bennett, or by Bennett for himself and Camden, and by taking title to the lands in themselves, thereby re-investing the purchase money in these very lands, never accounting to Camden or to his estate for his share or portion of the purchase money, and that thereby said lands became impressed with the original trust in favor of Camden and his heirs, in which they were held by Bennett. As evidence of the manner of re-acquiring these lands, and the true character of the transactions, appellants rely mainly on the evidence of Louis Bennett, one of the executors and devisees of Bennett. Respecting the 100 acres, Enoch Cain tract, he says, that he compromised with the Blackshires and got back this tract, that is, he says, he did not, but that Mrs. Howell, his sister, bought it and conveyed three-fourths interest therein to the other three devisees. He admits, however, that Mrs. Howell had no personal knowledge of the character or quality of these lands. He says that he "generally always" before making transactions concerning this real estate informed the others; that in regard to this Cain debt, he considered the best way to settle that up was to buy back the land, as he did, intending that his sister should have the benefit of it if she desired it, or if not, to divide it with the others. We quote literally from

his testimony on this subject the following: "Q. The sub-
stantial result of these transactions was then that the lands
were taken back because of the purchase money debts against
them, and not by reason of any new consideration passing from
the heirs or either of them to the persons from whom the land
was taken back? A. I think they were usually bought at
about the price of the original debt, and they paid off this
debt to the executors and the executors accounted to the estate
for it, taking their commission for the collection. Q. Neither
Mrs. Howell nor any other of the heirs who got land in the
manner referred to paid any other or further consideration to
the parties than the settlement of the outstanding debts against
the land? A. Not that I now recollect. I think they were
to pay the debt, and did pay it, and the money went out in the
settlement of the estate affairs. Anyhow, the executors became
chargeable with it. Q. In the taking back or re-purchase of
the one hundred and fourteen acres of the Wiley Taylor land
and of the sixty-five acres of the Benjamin H. Taylor, Trustee,
the same course was pursued as you have spoken of in reference
to the Cain land, except that I believe that the conveyance of
the last two parcels was made to all of the heirs instead of
to one. of them? A. Yes, they regarded . the purchase as a
good enough one and as a quick way of settling the debt
and relieving the executors from the necessity of selling the
land for the purchase money."

Interpreting this testimony in its own light, and in the
light of all other facts and circumstances in the case, it means
simply that the original purchase money notes or contracts
were surrendered, and that in consideration thereof, the lands
were surrendered or re-conveyed to one or all of the devisees
of Bennett, and that the share of Camden or his estate in the
purchase money, if any he or it had, become thus re-invested
in these tracts, subject to the original contract or agreement
between the parties. It is not pretended or shown in evidence
that the purchase money or any part of it which appellants
claim was thus accounted for to the executors, was ever paid
to Camden or his estate. Indeed they deny that he had or has
any interest therein. We adhere to our former opinion that
Bennett in his life time, and after him his devisees, at least
as to the lands unsold, held the title thereto in trust for Ben-

nett and Camden. If so Camden, or his estate, was entitled to his interest in the unpaid purchase money for all the lands sold, and, if, as manifestly appears his share of this purchase money became re-invested in these three tracts, the law will impress them with the same express trust under which they were originally held. *Crumrine* v. *Crumrine,* 50 W. Va. 226 (40 S. E. 341) ; *Marshall's Executors* v. *Hall,* 42 W. Va. 641 (26 S. E. 300). Other cases illustrating the application of this rule are : *Bank* v. *Domestic Sewing Machine Co.,* 99 Va. 411 (39 S. E. 141) ; *Francis* v. *Cline,* 96 Va. 201 (31 S. E. 10) ; *Thompson's Appeal,* 22 Pa. St. 16; *Maher* v. *Aldrich,* 205 Ill. 242 (68 N. E. 810) ; *Graham* v. *Graham,* 85 Ill. App. 460; *Nat. Bank* v. *Life Ins. Co.,* 104 U. S. 54; *Cox* v. *Cox,* 95 Va. 173. In *White* v. *Sherman,* 168 Ill. 589 (48 N. E. 128), the court holds, that the beneficiaries in such a trust may elect either to follow the trust funds into the new investment, or hold the trustee as for a breach of trust.

The second question calling for further consideration is covered by the third point of the syllabus, viz: whether a co-tenant, or *cestui que trust,* is entitled to have included in settlement with another co-tenant, or trustee, bonus or rent money received for an oil and gas lease. The rule affirmed on the former hearing is assailed on several grounds: First, it is said that if plaintiffs are entitled to this money it must be either by virtue of section 2, chapter 92, Code, authorizing recovery for waste committed; or by virtue of section 14, chapter 100, giving right of action to one co-tenant against another for receiving more than his just share or portion, such right of action being given a co-tenant in neither case, at common law. And the contention of appellees is that appellants not having been parties to the original lease contract, and the bonus or rent money not representing waste, but the consideration for such lease, or for delay in operations, no right or right of action is given them by said section 2, chapter 92, or by section 14, chapter 100; the latter section, as they affirm, applying only where one co-tenant, to the exclusion of his co-tenant, occupies more than his just share or portion of the common property, and takes more than his just share or portion of the rents, issues and profits issuing out of the land. It is conceded that the taking of oil or gas by one co-tenant, without the con-

sent of his co-tenant is, within the principles of *Williamson* v. *Jones,* 43 W. Va. 562; *Cecil* v. *Clark,* 44 W. Va. 659; *Same Case,* 47 W. Va. 402; *Same Case,* 49 W. Va. 459, and other cases, the committing of waste, giving right of action, and that said section 2, chapter 92, and not section 14, chapter 100, gives right of action therefor. The right in such accounting with him to charge a leasing co-tenant with bonus, rent, or commutation money received by him was not distinctly decided in *Cecil* v. *Clark,* 49 W. Va. 459, because not involved; but point one of the syllabus does hold that, "When a tenant in common has become liable for damages for waste under section 2, chapter 92, Code, by the removal of coal from the premises, the co-tenant injured may waive the tort and require an accounting for money had and received when the coal has been sold by such tenant." The fourth point of the same syllabus is: "The measure of damages in trover is the value of the property and interest thereon from the time of conversion." But the case on which we mainly rested is *McNeely* v. *South Penn Oil Co.,* 58 W. Va. 438, point three of the syllabus. It is insisted, however, that this case does not support us; that the proposition stated negatively in the third point of the syllabus is inapplicable, but that the proposition contained in the fourth point should control our decision in this case, namely, that "A mere demand for discovery as to, and accounting for, such rentals in a bill expressly denying the title of the lessor and validity of the lease, does not amount to a ratification or adoption of the lease." It is argued that although the bill in this does not, as did the bill in that case, while calling for an accounting of rents and profits, charge the lease to be void, and that it was executed without authority, and contained a prayer for the cancellation thereof, nevertheless it contains no specific words of adoption or ratification, and, if at all, only impliedly ratifies the same, by calling for an accounting, which should include rents and bonus money received. We are of opinion, however, that the bill in this case does, in equivalent words, adopt and ratify the lease. It contains no charge that the lease is void and executed without authority, and does not seek cancellation thereof. It alleges that plaintiffs have a one-quarter interest in the proceeds of the royalty oils, bonus and rent moneys received by defendant or either of them under

said lease, and the right thereafter to require the pipe line company, and the lessees under said lease to pay or deliver to their credit a like one-fourth of all the royalty oil then or thereafter to come to their hands, derived under said lease, and the territory covered thereby, and to have an accounting; and the prayer of the bill in even more distinct terms, is that plaintiffs may be decreed to have such interest in said property, and for relief accordingly. This demand could rest in no other ground than adoption and ratification of the lease contract. After decree for the relief thus sought the lease would become absolutely binding on plaintiffs. They would not thereafter be heard to deny it, or any of its terms. They would by force of such decree become parties to the lease by act of adoption and ratification.

How, then, upon principle, can appellants be denied an accounting by their co-tenants or trustees for all bonus or rent money received? The bonus and rent money cannot be regarded as things apart from the lease. They arise out of it, are called for by its very terms. Adoption and ratification thereof by appellants must give them the right to participate not in a part only, but in the entire consideration for the lease, as if parties thereto from the beginning. The case does not stand upon the strict principles of accounting as between co-tenant for waste committed, or for rents and profits taken by one to the exclusion of the other, and beyond his just share or proportion, but upon principle of adoption and ratification of an unauthorized contract.

For these reasons we adopt as our opinion on this hearing the opinion handed down on the former hearing, and will enter the same decree as then pronounced.

*Reversed and Remanded, With Directions.*