# CHARLESTON.

ELIZABETH E. ARNOLD *et als.* v. CHARLES E. MYLIUS *et als.*

CHARLES E. MYLIUS *et als.* v. ELIZABETH E. ARNOLD *et als.*
and
C. I. FARNSWORTH v. CHARLES E. MYLIUS.

Submitted February 8, 1921.   Decided February 15, 1921.

1.  PARTITION—*Questions of Title Dependent Upon Location of Boundary Lines Under Different Titles Cannot be Heard in Suit for Partition.*

     Questions of title to land dependent upon issues of fact proper for jury determination and arising out of uncertainty as to the location of boundary lines between tracts of land held under different and hostile titles, one of them by three persons and the adjoining tracts by two of them, cannot be

heard and determined by a court of equity in a suit for partitution of the tract owned by all of them as cotenants. (p. 732).

2.   SAME—*Court Held Not to Have Jurisdiction to Determine Ownership Where Boundaries in Dispute.*

Even though, in such case, the title of one of the cotenants in the subject of partition is merely equitable and he is a cotenant with another one of the three in the adjoining lands, there is no jurisdiction in such suit to determine the ownership of the lands in dispute by reason of the conflicting claims as to the location of the boundary lines. (p. 732).

3.   SAME—*That Hostile Titles Go Back to Common Source Held Not to Confer Jurisdiction.*

In such case, it is immaterial that the titles to all of the tracts of land so situated go back to a common source. When land once held as a single tract under a single title has been divided by alienation into separate tracts and conveyed to different people, the several titles so created are hostile to one another. (p. 732).

4.   TENANCY IN COMMON—*Agreement as to Boundary for Purpose of Voluntary Partition Held Not to Inure to Benefit of Cotenants in Another Tract.*

If a cotenant in one tract of land agree with his cotenants in another and adjoining tract, the owners of the two tracts being different, upon the location of the boundary line between the two tracts, for the purposes of a voluntary partition of the latter tract, with intent and purpose to retain his claim of title to the land lying between such location and what he believes to be the true location, his action in so doing does not inure to the benefit of his cotenants in the other or first mentioned tract. (p. 732).

5.   PARTITION—*Equity Has No Jurisdiction of Demand by One Cotenant for An Accounting Against Another for Land and Timber Sold Within Disputed Territory.*

In a suit for partition of a tract of land, a court of equity has no jurisdiction of a demand by one cotenant, for an accounting for land and timber sold by another, within territory in dispute by reason of conflicting claims as to locations of boundary lines, based upon strange and hostile titles. (p. 732).

6.   APPEAL AND ERROR—*Appellate Court Will Reverse Decree in Partition Ex Mero Motu, Though No Objection Made to Lack of Jurisdiction Below.*

If, in a suit in equity for partition of land, in which the pleadings and proofs introduce issues of title proper for jury

determination, arising out of claims made under strange and
hostile titles, no objection is made by any of the parties, on
the ground of lack of jurisdiction, and the trial court by its
decree determines such questions, the appellate court, on an
appeal from the decree, will reverse it, *ex mero motu*, and re-
mand the cause. (p. 736).

Appeal from Circuit Court, Randolph County.

Consolidated suits by Elizabeth E. Arnold and others against
Charles E. Mylius and others; by Charles E. Mylius and others
against Elizabeth E. Arnold and others; and by C. I. Farns-
worth against Charles E. Mylius. From decrees rendered,
Charles E. Mylius appeals.

*Reversed in part. Affirmed in part. Remanded.*

*W. B. & E. L. Maxwell,* for appellant.

*Le Roy See, H. G. Kump, D. H. Hill Arnold,* and *Blue &
McCabe,* for appellees.

POFFENBARGER, JUDGE:

The nature of this controversy and the character of the issues
made in the three consolidated suits in which the decrees com-
plained of on this appeal were entered are revealed by the state-
ment thereof in the opinion filed in *Arnold* v. *Mylius,* 85 W.
Va. 123 and 101 S. E. 78, dismissing an appeal entered in the
same causes, as having been improvidently allowed. This ap-
peal brings up the decree from which that appeal was attempted
and a decree subsequently entered, the effect of which was to
broaden the previous one so as to make it pass upon and dis-
pose of all the basic issues raised. The boundary lines of Lot
No. 21 of the Goff division of the Phillips and Law Survey are
now fixed, as to the Farnsworths, as well as the other parties
interested, for the purposes of the partition sought by the sev-
eral suits, on different bases, as determined by the issues as to
the southern and western boundaries of said Lot No. 21, in which
all of the parties are interested, the Arnolds owning one-half and
Mylius, or he and the Farnsworths, the other half.

As will appear by reference to said statement, the pleadings
make an issue of title between the Arnolds and Mylius, as to
about 300 acres of land, dependent upon the location of the
boundary line between Lot No. 21 and Lot No. 15. If that
land is in Lot No. 15, the Arnolds never had any title to it,

the title thereto being now in Mylius and the Farnsworths. If on the other hand, it is in Lot No. 21, the Arnolds have title to it in common with Mylius. The Mylius title to Lot No. 15, according to his claim, goes back to a sale of that lot, by David Goff, Commissioner of Forfeited and Delinquent Lands, to L. D. Morrell, in 1840, and a conveyance of it to him by a deed dated, December 13, 1841. Later, it having become again forfeited, Goff, as Commissioner of School Lands, sold and conveyed it to Squire B. Ward, by a deed dated, May 6, 1871. From Ward, it passed to Isaac Baker and others, and from them to Mylius and Carl Kupfer and Farnsworth became interested in it with him. The Arnold title to Lot No. 21 also goes back to the Goff division of the Phillips and Law Survey. Goff sold it to Samuel Morrison. Later it became delinquent for nonpayment of taxes, in the name of John L. Hare, and was sold by the sheriff and conveyed by Wm. Bennett, Recorder, to Nicholas Marstiller, who by a deed dated, March 2, 1878, conveyed it to Jonathan Arnold, the ancestor of the Arnolds who are parties to these suits. Mylius acquired an undivided half of that lot and Farnsworth became interested in it with him.

The conflict in title on the western side of Lot No. 21 is similar. On that side, Lot No. 20 of the Phillips and Law Survey adjoins it, and, in that lot, the Arnolds do not claim ever to have had any title. Baker Brothers, Isaac Baker and others, owned 535 acres in it, which they conveyed to Mylius by a deed dated, Aug. 18, 1879, and Kupfer and Farnsworth became interested in it with him.

The Arnold claim and contention as to the location of Lot No. 21, would shift it south about 162 poles and west about 100 poles from that given it by the lines laid down on the Goff map with reference to which it was originally sold and conveyed by him, and thus make it take in part of the northern end of Lot No. 15 and part of the eastern portion of Lot No. 20.

The tax deeds and some of the other conveyances under which Mylius claims title, in all of the three lots contain particular descriptions purporting to locate them agreeably to the contention of the Arnolds, but they go back by reference and deraignment to the lots as sold and conveyed by Goff in 1840. Most,

if not all of them contain, in some form, general descriptons by the numbers given the lots by Goff in his sales, deeds and map. While there has been much inconsistent conduct on the part of Mylius with respect to the locations of his lands, and he has uniformly claimed for and against location as determined by the Goff map, as it has suited his interests, his position being determined always by the situation and circumstances and the parties he was dealing with, and possibly some such conduct on the part of all the other parties, it remains, nevertheless, that he has always been insistent upon his right to adhere to the locations agreeable to the Goff map, in his contentions for land in the northern end of the original survey.

He sold the timber off the land in dispute as between Lots Nos. 15 and 21. He sold and conveyed to the Otter Creek Boom and Lumber Company, through Wm. G. Parsons, 181¾ acres, as being in Lot No. 21, and 478¾ acres, as being in Lot No. 20. The decree he complains of extends Lot No. 21 westward so as to include that 478¾ acres and directs that, in the partition of Lot No. 21, he shall be charged with that area, as having been received or taken out of his share. In the opinion filed by the trial court as well as in the brief filed for the Arnolds, it is asserted that he had no land in Lot No. 20 at the date of his deed to Parsons, because he had previously conveyed his entire interest in the 535 acres, known as the Hartman land, to Carl Kupfer, and, apparently, he had, and Kupfer had conveyed the same land to the Otter Creek Boom and Lumber Company. Nevertheless, the deed from Mylius to Parsons recites an unrecorded deed from Kupfer to him for the land conveyed to Parsons. No doubt, these inconsistent acts are founded upon differences in location, and the lands conveyed by him and Kupfer to the Otter Creek Company are not identical, he having conveyed to Kupfer and Kupfer to the Otter Creek Company, with reference to the locations claimed by the Arnolds, and he to Parsons, with reference to the location he now contends for. At any rate, he is charged with what he did convey, as being in Lot No. 21, while he contends it is in Lot No. 20, and if he is right, he should not be charged with it. Here, as well as at the south of Lot 21, there is a controversy as to boundary lines, upon the determination of which very substantial

rights of the parties depend. Indeed, the litigation between Mylius and the Arnolds is all involved in the question of location and boundaries, and the Farnsworths stand with the Arnolds. Having sold their interest in the Hartman land, they no longer claim anything in Lot No. 20. It is to their interest to extend Lot No. 21 as far west as possible. In the south, it is practically immaterial to them which way the dispute is settled, as they are interested on both sides. But they are safer with the Arnolds, because there has been a partition between them and Mylius as to Lot No. 15, which might prove to be an obstacle to their assertion of further right in that lot.

It must be apparent from what has been said here of the nature of this controversy, that it involves the determination of hostile claims of title in two instances, a conflict of that kind at the south of Lot No. 21, and another at the west of that lot. Mylius' title to Lot No. 15 is, for the purposes of this litigation, a title different from that of the Arnolds to Lot No. 21. They do not hold under the same deeds. They are not cotenants as to Lot No. 15. If the disputed territory is in Lot No. 21, they are cotenants in it. If not, that relation does not subsist between them, as to it. In the latter case, it never did subsist between them. Whether they are cotenants in it, then, depends upon which of the two hostile titles covers it. The same thing is true of the other dispute. Mylius and Arnold were never cotenants in any part of Lot No. 20, in which the Hartman land was located. To bring the former into this suit, or permit him to come into it, upon an issue as to whether the 478¾ acres of land he conveyed to Parsons is in Lot No. 21, is to take jurisdiction of a controversy involving adverse and hostile titles. In neither case, is the question whether parties who once were cotenants have ceased to be such, and it turns upon the application of adverse title papers. It matters not that these lots were all once parts of the Phillips and Law Survey. The doctrine of common source has no application. When a common title has been split up by division of the land into separate and several holdings and ownership, the titles to the different parts are hostile.

For the reasons here indicated, these disputes, in so far as they involve issues of fact proper for jury determination, can-

not be brought within the jurisdiction of a court of equity, even when the relief sought is partition, for the relation of cotenancy in the subject to be divided is absolutely essential to jurisdiction to determine questions of title in suits in equity for partition.    Confirmation of this view and conclusion will be found in even a casual reading of our decisions bearing upon the question.    *Cecil* v. *Clark,* 44 W. Va. 659; *Carberry* v. *W. Va. & P. R. C. Co.,* 44 W. Va. 260; *Davis* v. *Stelle* 43 W. Va. 17.    The issues upon which these controversies turn are obviously issues of fact proper for jury determination.    They are questions of location and boundaries of land upon which extrinsic evidence as well as the title papers are to be considered.    Indeed, they are just such questions as usually go to juries and ought to, for, in our jurisprudence, they are the triers of issues of fact.

One proposition relied upon in argument, if sound, might obviate the difficulty in the case of the conflict between the locations of Lots Nos. 15 and 21, and that is that the Arnolds as cotenants with Mylius in the latter lot, are entitled to the benefit of his conduct in the partition effected between him and Kupfer and Farnsworth, by which the north line of Lot No. 15 was fixed for the purposes of the partition, agreeably to the contention of the Arnolds as to that location.    They say his act in so fixing it inured to their benefit, as his cotenants, and fixed that line for Lot No. 21 as well as for Lot No. 15.    The authorities relied upon for the proposition do not sustain it. Nothing in the transaction indicates purpose on his part to claim anything by way of addition to Lot No. 21 or take anything from that lot.    If it did not extend to the line so fixed Mylius had an independent title to what was left of Lot No. 15 in which Arnold was not interested, and there is no proof that he so located the line for the benefit of the title in which Arnold was interested with him.    In asserting his claim to the disputed land as being in lot No. 15, Mylius is not assailing the title of his cotenant in Lot No. 21, for whether that title covers this land is the very matter in controversy.    If it did, then, of course, any acquisition of additional title to it would inure to the benefit of his cotenants.    Neither the authorities relied upon nor any found by us go so far as to say the independent act of a cotenant

87 W. Va.

can add anything to the common property that is not covered by the common title.

Inurement of benefit in that way depends upon community in title, and, if there is no such community, the rule can have no application. All doubt as to this, however, is removed by the agreement between Mylius and Kupfer. They were aware of the ground for dispute as to the true location of the line. Kupfer wanted certainty in what was to come to him and all wanted it as to what they divided among themselves. Hence, they divided what they knew they owned, and then Kupfer assigned to Mylius all of his "right and title and any claim" he might have "north of and outside of the line as laid down and surveyed by Sherwood, adjoining the Hare land of any land" which might belong or had formerly belonged to Baker Brothers, except his interest in the 535 acre Hartman tract. The Hare land mentioned in the assignment was Lot No. 21, and the land so assigned could have been none other than the land between the Sherwood line and Lot No. 21, which, if there was any, had belonged to Mylius and his co-owners of Lot No. 15, under a title in which Arnold had no interest.

A somewhat different element is introduced by the Farnsworth petition which sets up an equitable title, under Mylius, to an undivided one-fourth of Lot No. 21. Of course, a court of equity will take cognizance of an equitable title in a suit for partition or for other equitable relief, for the owner thereof has no standing in a court of law. But it cannot be logically nor consistently claimed that after taking jurisdiction, it will go further in the exercise thereof than it would in the enforcement of a right based upon both the legal and the equitable title. It will enforce the equitable title of the Farnsworths, if any, against Mylius, to the extent of extraction of the legal title to that interest from him and vesting it in the owners of the equitable title. That it could do without awarding partition. As the equitable owner has right to that and to partition also, he may have both in the same suit. For these purposes, a court of equity may in a partition suit settle a dispute as to the ownership of the equitable title. This is so elementary and clear that authority need not be cited for it. However it does not follow that the owner of an equitable interest in a tract of land may

draw into a suit for partition a question of title of which the court could not take cognizance at the instance of the owner of complete and perfect legal title. No doubt he may compel his trustee to convey to him such legal title as he has to the land involved in dispute on account of uncertainty as to boundary lines, so as to enable him to litigate the question of title arising out of adverse claims, in a legal forum; and no reason is perceived why he may not obtain such relief in a suit for partition and take a decree for partition of so much of the land as is not involved in the dispute. The limitation here asserted may be made clearer by a simple illustration. If the Farnsworths were the owners of the equitable title to the whole of Lot No. 21, and Mylius held the legal title, they manifestly could not have questions of title arising out of conflicting boundaries between that lot and Lots Nos. 15 and 20 settled in a suit in equity against Mylius to compel him to convey the legal title to them. If a third party claimed the disputed land as being part of Lot No. 15 or Lot No. 20, under a title different from that under which the title to Lot No. 21, is held, the lack of equity jurisdiction to determine the dispute would be perfectly clear. Such third party would have his constitutional right of trial by jury and there would not be a shadow of equitable right against him. That the holder of the legal title to Lot No. 21 is the claimant of the disputed territory, under a different title to Lot No. 15 cannot in the nature of things alter the rule. His right is just as clear and just as independent of the title to Lot No. 21, as if he were a stranger to the title to that lot. Nor can it make any difference, that the Farnsworths and Mylius are cotenants in all of the lots. If there were no disputes as to areas and locations, the three lots could not be partitioned in one suit, because of the diversity of interests, the Arnolds having no interest in Lots Nos. 15 and 20 and having an interest in Lot No. 21. These diverse interests cannot be brought into one suit for partition, for the right of compulsory partition does not extend beyond the community of title. *Inman* v. *Prout,* 90 Ala. 362; *Rechefus* v. *Lyons,* 69 Md. 589; *Hunnewell* v. *Taylor,* 3 Gray (Mass.) 111; *Allen* v. *Hoyt,* 5 Metc. (Mass.) 324; *Pankey* v. *Howard,* 47 Miss. 83; *Jackson* v. *Myers,* 14 Johns. (N. Y.) 354; *Simpson* v. *Wallace,* 83 N. C. 477; *Harman* v.

*Kelley,* 14 Ohio 502; *Smith* v. *Pratt,* 13 Ohio 548; *Brownell* v. *Bradley,* 16 Vt. 105; 30 Cyc. 176. While these authorities are not directly in point, they illustrate the strictness of the procedure in partition and the limitations of the remedy. They demonstrate the inability of the court to go beyond the relation of cotenancy and take cognizance of matters outside thereof or lying beyond it. "None of the cotenants (in a suit for partition) can be required to do equity with respect to any matter, or to satisfy any demand, disconnected from the property of the cotenancy." 30 Cyc. 230. "Equity will not exercise jurisdiction (in partition) where the legal title is doubtful." 30 Cyc. 243. Of course, it is not our province now to point out the remedies or methods of procedure, for solution of the problem presented by the controversy respecting title and vindication of the equitable title held by the Farnsworths, if any; but it may be observed that they can easily obtain the legal title to such interests as they have and also that there are circumstances under which one cotenant may sue another in ejectment. Code, ch. 90 sec. 16; *Taylor* v. *Hill,* 10 Leigh 457; *Buchanan* v. *King,* 22 Gratt. 414. It suffices here to say the equitable title of the Farnsworths confers no jurisdiction upon a court of equity in a suit for partition, to determine a question of title dependent upon issues of fact and arising out of claims based upon strange and hostile titles.

None of the parties have interposed any objection to the procedure or the decrees, on the ground of lack of equity jurisdiction. On the contrary, all of them have invoked the aid of the court and acquiesced in its cognizance of the causes. However, consent cannot confer jurisdiction. Though neither party objects on the ground of lack of jurisdiction, if there is none, the court itself will decline to proceed in the cause. *Cresap* v. *Kemble,* 28 W. Va. 603; *Watson* v. *Ferrell,* 34 W. Va. 406; *Railway* v. *Gibbons,* 35 W. Va. 57; *Thompson* v. *Railroad Co.,* 6 Wall. (U. S.) 134; *Barney* v *Baltimore City,* 6 Wall. (U. S.) 280; *Capron* v. *Van Noorden,* 2 Cr. (U. S.) 126; *Bell* v. *Fladd,* 28 S. C. 313; *W. U. Tel. Co.* v. *Taylor,* 4 Ga. 408. Parties, by their joint action, will not be permitted to break down or ignore the line of demarkation between the jurisdiction of courts of equity and courts of law, and, certainly not, in instances

in which the issues are such as ought to be determined by juries. *Freer* v. *Davis,* 52, W. Va. 1, 14.

This conclusion makes error in the decree obvious, in so far as it departs from the Goff plat, in the location of Lot No. 21, and makes Mylius account in the partion of that lot, for land sold by him, as lying in Lot No. 20. There is jurisdiction, of course, to partition Lot No. 21, in so far as the location thereof is not in controversy. But the area and location of the undisputed area thereof is left in doubt and uncertainty by the record. Apparently there is some land in the lot as to which common title is admitted, but it would be very difficult if not impossible to determine its quantity or exact location here, without the aid of counsel. In as much as the plain object of these suits was settlement of disputes of which the court had no jurisdiction, it may be that partition of what is admittedly common property may not be desired by any of the parties. Under these circumstances, it is deemed advisable wholly to reverse the decrees in so far as they adjudicate the right of partition, and remand the causes for award of such relief as can be given in them.

Two of the money demands set up against Mylius, in the Farnsworth petition, are for land and timber sold within the disputed areas. As to them, the court below should have sustained the demurrer to it, for reasons already stated. They were not cognizable in this suit. The demurrer as to one of them was sustained on the statute of limitations. The court's ruling thereon will be affirmed for a reason different from that stated in the decree. A third demand of that kind, based on a sale of 181¾ acres of land admittedly lying within Lot No. 21, the amount whereof is not separately stated, is clearly barred by the statute. *Sommers* v. *Bennett,* 68 W. Va. 157.

A contract exhibited with the Farnsworth petition and signed by Mylius, bound the latter to convey to D. D. T. Farnsworth an undivided fourth of Lot No. 21, known as the Arnold and Taylor land as well as the Hare land, in consideration of payment of the purchase money by Farnsworth, stipulated that, out of the proceeds of the sale thereof, Mylius would repay half of the money, and that Farnsworth was to have an equal voice with Mylius in the sales of the land. This contract is susceptible of only one interpretation. They were to own the land equally and

sell it together and share the proceeds. Farnsworth paid some of the money. The proof is not clear as to full payment. But numerous letters written by Mylius long after the transaction impliedly, if not expressly, admitted Farnsworth's interest in the land. We are unable to perceive any ground upon which the finding of the trial court upon the issue as to that title can be disturbed. Mylius assumed an express trust in favor of Farnsworth and there is no proof of any repudiation or disavowal thereof. The lapse of time is very considerable, but, throughout the greater part thereof, Mylius recognized the trust.

Upon the principles and conclusions stated, the decrees complained of will be reversed in so far as they adjudicate right of partition of the lands mentioned and described in the bills, answers and other pleadings and papers in the cause, and costs against Mylius, and in all other respects affirmed and the causes remanded for award of partition of any of such lands as are not in dispute respecting the title thereof, if the parties hereto shall desire partition thereof or for a proper decree of partition after the true boundary lines between the land held in cotenancy by the parties hereto and adjoining lands shall have been fixed and determined by proper proceedings in a court of law, as in the opinion of the court below may be proper and expedient under all of the circumstances. Costs in this court will be decreed to the appellant.

*Reversed in part. Affirmed in part. Remanded.*